John CANTU, Appellant,

v.

The STATE of Texas, Appellee.

No. 03–97–00028–CR.

Court of Appeals of Texas,
Austin.

May 6, 1999.

Rehearing Overruled June 17, 1999.

**724**

Christopher P. Morgan, Austin, for Appellant.

Ronald Earle, District Attorney, James Adkins, Assistant District Attorney, Austin, for State.

Before Justices JONES, KIDD and B.A. SMITH.

BEA ANN SMITH, Justice.

Appellant John Cantu, a juvenile, was charged with the offense of first-degree murder. *See* Tex. Penal Code Ann. § 19.02(b)(2) (West 1994). After a hearing before the juvenile court, Cantu was certified to stand trial as an adult. *See* Tex. Fam.Code Ann. § 54.02(a)(3) (West 1996). In a trial before the district court, a jury found Cantu guilty and assessed his punishment at forty years' imprisonment. In twenty-one issues on appeal, Cantu disputes the legal and factual sufficiency of the evidence and argues that the trial court erred in refusing to charge the jury on a lesser-included offense of deadly conduct. *See* Tex. Penal Code Ann. § 22.05 (West 1994). Cantu also claims that his federal and state constitutional rights and his state statutory rights were violated by the admission of psychiatric testimony from his court-ordered certification examination during the penalty phase of his trial. In addition, Cantu claims that the trial court violated his rights under the Confrontation Clause by limiting his cross-examination of a witness, and raises several other evidentiary points. We will affirm the conviction, but reverse the assessment of punishment and remand the cause to the trial court for further proceedings.

## BACKGROUND

This case arises from a gang-related shooting. On October 28, 1995, Gloria Nauman hosted a Halloween party at her home, located in a rural area in southeast Austin. Nauman's house is set back some distance from the road. A driveway runs from the house to the road, crossing over a large field and a tree-lined creek. On the night of the party, many of the guests parked in the field and made the short

walk down the driveway and over the creek to the house.

Among those attending the party were Salvador Garcia, Steve Alford, and Lydia Perez. Around 11:00 p.m., the three teenagers decided to leave together, and started walking from the house out to Alford's vehicle, a Ford Bronco. On the way they encountered another teen who appeared to be drunk. This person identified himself as "Trebla,"[1] a member of the street gang "S.T.B.C."[2] Upon learning that Garcia was a member of the Latin Kings, a rival gang,[3] "Trebla" became angry and threatened to kill Garcia. A number of people intervened, including Perez, a sixteen-year-old girl who was a friend of Garcia's. "Trebla" momentarily left, apparently for the purpose of finding fellow gang members to help him fight Garcia. At this point, Perez, Garcia, and Alford got into the Bronco and started to drive off the property.

As they were driving away, a group of young men ran after them. Before the Bronco could reach the road, gunshots were fired at their car. Perez, sitting in the passenger seat, was struck on the right side of her head by a single .38 caliber gunshot and died several days later. Garcia, sitting in the backseat, was hit by several bullet fragments. Alford was not injured.

Appellant, another member of the S.T.B.C. gang, was arrested at the scene after several witnesses identified him as the person carrying a revolver earlier in the evening. Nauman also identified him as the person she saw carrying a black revolver and shooting at the Bronco. Cantu was taken into custody and an atomic-absorption test was conducted to determine whether various elements contained in gunpowder residue were present on his hands. The test came back positive. A .38 caliber revolver with some rust on its barrel and a wood handle was recovered in the vicinity with five empty casings; four spent shells from a .32 caliber semiautomatic pistol were also found at the scene. Police never found the semiautomatic weapon.

At the time of the shooting, Cantu was fifteen years old. After being taken into custody, he had counsel appointed and was taken before a magistrate. His counsel attended the hearing before the magistrate, where Cantu was advised of his rights. A juvenile court appointed Dr. Jeff Ezell, a psychologist, to conduct a diagnostic examination of Cantu to determine whether he should be tried as an adult pursuant to the Family Code. *See* Tex. Fam.Code Ann. § 54.02(d) (West 1996). Cantu's counsel did not attend the psychological exam, although he was aware of it and apparently discussed it with his client. Based on test evaluations and observations made during the interview, Dr. Ezell testified at the certification hearing that Cantu should be tried as an adult. The juvenile court accordingly waived jurisdiction and transferred Cantu to district court, where he was indicted for the offense of first-degree murder. Cantu pleaded not guilty and was tried before a jury, which found him guilty. During the penalty phase, Dr. Ezell testified that Cantu showed no remorse during his diagnostic exam, and diagnosed him as a sadistic sociopath without a conscience who was unlikely to change in the future. Other testimony was presented by the prosecution and defense, and Cantu was sentenced to forty years' imprisonment. Cantu appeals his conviction on sufficiency and evidentiary grounds. In addition, Cantu appeals his sentence on grounds that his constitutional and statutory rights were violated by the

1. At trial, Garcia explained that "Trebla" was the person's name spelled backwards.

2. "S.T.B.C." is an acronym for the Street Tagging Bombing Crew.

3. Garcia testified that he was actually a former member, having been "beaten out" of the gang. During the confrontation, however, a group of people told "Trebla" that Garcia was a "King," at which point Garcia confirmed that he was a Latin King.

admission of Dr. Ezell's testimony at the punishment phase and by the prosecutor's comment during jury argument on appellant's failure to testify.

## DISCUSSION

### Legal and Factual Sufficiency

■ In his first two issues on appeal, appellant contends that evidence at trial was legally and factually insufficient to support his conviction. We address first whether there was legally sufficient evidence to support the jury finding that appellant committed first-degree murder. The jury found that Cantu intended to cause serious bodily injury to an individual and committed an act clearly dangerous to human life by shooting Lydia Perez with a firearm and causing her death. See Tex. Penal Code Ann. § 19.02(b)(2) (West 1994). In evaluating a conviction for legal sufficiency, we ask whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. The relevant question is, after viewing the evidence in the light most favorable to the verdict, whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); Williams v. State, 958 S.W.2d 186, 190–91 (Tex.Crim.App.1997).

The State's evidence included testimony from witnesses who identified Cantu as the man they saw pointing a gun at a dog earlier in the evening. Two of the party guests, Carrie Brown[4] and Larry Clark, testified that they were talking in the garage when a small dog walked up to a group of people nearby. Someone joked that the dog might bite. Both Brown and Clark said that appellant pulled a gun out of his pocket, pointed it at the dog's head, and said either "no, he won't" or "well, I got something for that dog." Brown described the gun as a black revolver, with a rusty color where the black had rubbed off. Clark said the gun was a revolver, made of blue steel with an old wooden handle, with rust on the gun barrel. Both identified the .38 revolver that police recovered from the scene as looking like the one the appellant pulled out of his pocket. Both described appellant as wearing a greyish-white shirt and blue pants. Steve Alford, the driver of the Bronco, described one of the shooters as wearing the same clothing.

Brown, Clark, and another guest, Melissa Garmon, testified that appellant was one of several young males they saw running toward the Bronco just before the shootings. As they ran, Clark heard one of the group tell Cantu, "Not here, man. Not here. Don't do it here." Clark testified that Cantu had his hand in his pocket as he ran, the same pocket from which Clark had seen Cantu retrieve the pistol minutes earlier in the garage. Garmon testified that Cantu was carrying a gun when she saw him run by.

Gloria Nauman had asked her son Shannon to go out to the gate near the road and eject people who were not invited to the party from the property. As Nauman was going out to check on Shannon, she saw appellant standing near the carport. Nauman followed appellant as he walked toward the driveway. She testified that when he got to the bridge, she saw him pull out a black revolver and start running. Nauman ran after him until he stopped and she heard someone yell, "Mom, stop." At that point she saw the Bronco and fire flash from the gun. After the gunshots ceased, she testified, the Bronco drove off and Cantu disappeared. Nauman testified that later she saw appellant in handcuffs and he told her, "Ma'am, you know it wasn't me. And if you say it was me we'll get you."

---

4. At the time of trial, Carrie Brown had married Larry Clark and changed her name to Carrie Clark.

Salvador Garcia testified that appellant was a member of S.T.B.C., a gang that had a rivalry with Garcia's former gang, the Latin Kings. The State presented evidence that Cantu had traces of gunpowder residue on his hands consistent with his having fired a weapon on the night of the shooting. The State also presented expert testimony that the bullet that killed Perez was fired from the .38 revolver found at the scene.

Brown and Clark testified that after the shooting, they were standing near some trees on the house side of the creek. They heard rustling in the bushes behind them, and both saw appellant standing there, looking nervous and apparently using them as a wall between him and the police. The State presented evidence that Cantu had fresh scratches on his right arm that night that were consistent with the type of injuries one might sustain running through bushes or trees. A police officer testified that the area surrounding the creek was surrounded by very heavy brush. Viewing the foregoing evidence in the light most favorable to the verdict, a rational jury could have found beyond a reasonable doubt that Cantu fired a .38 caliber revolver at the Bronco and thereby caused the death of Lydia Perez. We therefore hold that the evidence is legally sufficient to sustain the jury's verdict.

We now turn to the question of whether the evidence is factually sufficient to support conviction. "When the court of appeals conducts a factual-sufficiency review, the court views all the evidence equally, including the testimony of defense witnesses and the existence of alternative hypotheses." *Angelo v. State*, 977 S.W.2d 169, 174 (Tex.App.—Austin 1998, pet. ref'd) (op. on reh'g). However, we must be appropriately deferential to the jury verdict, so as to avoid substituting our judgment for that of the fact finder. *See Clewis v. State*, 922 S.W.2d 126, 133 (Tex. Crim.App.1996). The appellate court should set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See id.* at 135; *Stone v. State*, 823 S.W.2d 375, 381 (Tex.App.—Austin 1992, pet. ref'd, untimely filed).

While Cantu appears to concede that the evidence sufficiently identifies him as one of the shooters, he disputes that the evidence proved beyond a reasonable doubt that *he* was the person who shot the .38 caliber revolver into the Bronco. Instead, he contends, the evidence suggests that there may have been a third shooter who fired the fatal shot. As support, he cites the following facts from the record:

(1) Larry Clark, a man who is very familiar with guns, told police that night that he thought the gun in Cantu's hand looked small, and guessed it was a .22 caliber gun.

(2) Witnesses disagree on the number of shots fired. Carrie Brown said it could have been less than ten, but as many as twenty. Salvador Garcia testified that there were "several" shots, and answered "yes" when asked if there could have been as many as fifteen.

(3) The atomic absorption test showed the highest level of residue on Cantu's left palm. The state's expert testified that residue from a fired weapon is more likely to turn up on the back of the hands, not on the palm.

(4) Gloria Nauman testified that she saw Cantu shooting from behind the Bronco, which, if true, would seem to place him outside the trajectory of the fatal bullet, which was apparently fired from the right rear-end of the vehicle.

(5) At the certification hearing, Nauman had testified that she did not see a gun and she did not identify Cantu as the person she saw shooting. She also noted at trial that previously she was told the color of the gun and the fact that it was a revolver by someone else.

(6) Steve Alford saw a man shooting with his right hand. Melissa Garmon said she saw Cantu carrying a gun in his left hand as he ran to the field.

(7) Shannon Cearly, Gloria Nauman's son, saw a man in a white shirt and red cap shooting a chrome semiautomatic at the car.

After reviewing the record, we find that these purported inconsistencies do not undermine the overwhelming weight of the evidence so as to make the verdict clearly wrong and unjust. While Salvador Garcia answered "yes" when asked if there could have been as many as fifteen gunshots, the great variety among witnesses as to the number of shots they heard shows this evidence's general lack of probative value. For instance, police officer John Pendergrass "guesstimated" that he heard fifteen to twenty shots; Carrie Brown said that it seemed like more than ten shots, but could have been fewer; Larry Clark heard one series of "four to six really quick shots" followed by several more shots; Gloria Nauman heard seven shots, and Melissa Garmon heard only three. Most of the witnesses stated that they were uncertain in their estimates or were simply guessing. Given this fact, together with the physical evidence of spent shell casings suggesting that a total of nine shots were fired from a .38 revolver and a .32 semiautomatic, the jury was entitled to discount the testimony of those witnesses who believed they heard a substantially larger number of shots.

A rational fact-finder could also have found that Clark was mistaken when he told the police at the scene that he guessed Cantu's gun was a .22 caliber. At trial, Clark testified that he was not familiar with .22 caliber revolvers and that he saw the gun from a distance of three to five feet.[5] Clark's description of the weapon carried by Cantu otherwise matched the gun recovered from the scene. Moreover, Clark's testimony that he "guessed" it was a .22 is the only suggestion there was a .22 at the scene. Gloria Nauman and Shannon Cearly identified two different shooters, one carrying a revolver and one carrying a semiautomatic. Casings found at the scene came from a .38 revolver and a .32 semiautomatic. There is no other indication of a third gun or a third shooter.

While Cantu disputes the reliability of Nauman's testimony, it is the jury who is the exclusive judge of the credibility of the witnesses and the weight to be given their testimony. *See Miller v. State,* 909 S.W.2d 586, 593 (Tex.App.—Austin 1995, no pet.). Given Nauman's testimony that Cantu had threatened her, a jury could reasonably believe that she may have been afraid to identify Cantu at an earlier proceeding. Finally, although the State's expert testified that residue found on the *palm* of the hand does not tend to prove that a person fired a gun, there were also significant amounts of residue found on the *back* of Cantu's hands. Any explanation for why Cantu might have sustained residue on his palm[6] does not alter the fact that levels were found on the back of his hands sufficient to establish that he fired a weapon that night. After reviewing the entire record, we conclude that the evidence is factu-

---

5. Clark's exact testimony at trial is as follows:
 Q. ... When you initially described that weapon to the police you described it as I believe a .22.
 A. Yes, sir.
 Q. Are you certain about that?
 A. Well, the officer asked me to give a guess, I think, of what type of weapon, what size weapon, what size caliber was. And to my knowledge, I saw it from a distance. I couldn't really tell. It was small, so I thought maybe it was a .22.

6. Competing hypotheses to explain the level of residue found on Cantu's palm included defense counsel's suggestion that Cantu might have been waving his left hand and making gang signs in the vicinity of a .38 being fired by someone else, and the State's theory that he might have touched the gun with his left hand before tossing it into the bushes. The State's expert accepted both explanations as possible.

ally sufficient to support the jury's verdict. Appellant's first two issues are overruled.

*Lesser–Included Offense*

Cantu asserts in his third issue on appeal that the trial court erred in refusing to instruct the jury on the lesser-included offense of deadly conduct. The offense of deadly conduct is committed when a person knowingly discharges a firearm at one or more individuals, or in the direction of a vehicle, and is reckless as to whether that vehicle is occupied. *See* Tex. Penal Code Ann. § 22.05(b)(1), (2) (West 1994).

 A two-pronged test must be satisfied before a jury charge on a lesser-included offense can be given. First, the lesser offense must be included within the proof necessary to establish the charged offense; second, there must be some evidence that if the defendant is guilty, he is guilty only of the lesser offense. *See Aguilar v. State*, 682 S.W.2d 556, 558 (Tex. Crim.App.1985); *see also* Tex.Code Crim. Proc. Ann. art. 37.09 (West 1981). In applying the test, the trial court should determine whether the evidence of the lesser offense would be sufficient for a jury rationally to find that the defendant is guilty only of that offense, and not the greater offense. *See Rousseau v. State*, 855 S.W.2d 666, 672–73 (Tex.Crim.App.1993).

 Cantu argues that the testimony of Larry Clark is some evidence that he might have been guilty only of firing at or in the direction of the Bronco. As discussed above, Clark's original statement to the police is the only indication that there was a .22 caliber gun at the scene. Moreover, Clark testified that his original statement to police was a guess, that he was not

familiar with .22 caliber guns, and that he saw the gun briefly and from some distance. While there is testimonial and physical evidence of two shooters and two guns, there is no more than a mere scintilla of evidence that another gun was fired that night.[7] We find that a jury could not rationally extrapolate from Clark's testimony or from any other source that there was a third gun and a third shooter. Accordingly, we hold that the trial court did not err in refusing to charge the jury on the lesser-included offense of deadly conduct. Appellant's third issue on appeal is overruled.

*Evidentiary Points*

In four issues on appeal, Cantu argues that the trial court erred in admitting and excluding certain evidence. On re-cross, defense counsel asked Clark to look at pictures of guns to determine whether they appeared different from the gun he saw appellant with earlier in the evening. The State objected on the ground that the pictures were not in evidence, that Clark was not an expert, and that the pictures were not relevant. The trial court sustained the State's objection. On appeal, Cantu argues that the court's ruling violated his Confrontation Clause rights under the federal and state constitution and under the rules of evidence. The State contends that appellant waived his constitutional claims by not specifying them as the basis for his objections at trial.

 The State is mistaken in its assertion that appellant had any burden to specify the grounds of error at trial. The State was the objecting party. Appellant's

7. Cantu also argues that the apparent discrepancy between the number of .32 and .38 shell casings found at the scene (nine) and the number of shots reported by some witnesses (as many as fifteen to twenty) may reasonably be interpreted as showing that Cantu fired a third gun that was not the murder weapon at the Bronco. We have already explained why the great variety among witnesses as to the number of shots heard, and the uncertainty expressed by the witnesses, makes this evidence lacking in probative value. More importantly, however, the fact that only nine shells were recovered by the police in no way limits the number of .32 and .38 gunshots fired to nine; rather, it suggests that a total of *at least* nine shots were fired from these two weapons. The testimony regarding the number of shots fired amounts to a mere scintilla of evidence that Cantu fired a gun other than the murder weapon.

only burden was to make an offer of proof or bill of exceptions to show the facts he could have proved through cross-examination. In this case, appellant made no formal offer of proof. However, "[a]n informal bill will suffice as an offer of proof when it includes a concise statement of counsel's belief of what the testimony would show." *Love v. State*, 861 S.W.2d 899, 901 (Tex.Crim.App.1993); *see also Virts v. State*, 739 S.W.2d 25, 29 (Tex.Crim.App.1987) (when trial court restricts cross-examination on impeachment grounds, counsel merely required to establish general subject matter he intended to question the witness about and explain why it should be admitted into evidence). Here, defense counsel offered that his cross was necessary to establish that "there's a zillion guns that look identical" to the gun Clark identified as being in Cantu's possession. This statement was sufficient to put the court on notice as to what testimony defense counsel expected to elicit from Clark. We therefore find that appellant properly preserved error.

■■■ The Confrontation Clause affords criminal defendants the right to confront witnesses against them through cross-examination. *See* U.S. Const. amend. VI; *Lagrone v. State*, 942 S.W.2d 602, 613 (Tex.Crim.App.), *cert. denied,* —— U.S. ——, 118 S.Ct. 305, 139 L.Ed.2d 235 (1997). However, the trial court maintains a broad discretion to impose reasonable limits on cross-examination. *See Hurd v. State*, 725 S.W.2d 249, 252 (Tex.Crim.App. 1987); *see also* Tex.R. Evid. 611(a). In particular, a trial court may restrict cross-examination to avoid harassment, prejudice, confusion of the issues, endangering the witness, and the injection of cumulative or collateral evidence. *See Lagrone*, 942 S.W.2d at 613. The trial court's decision to restrict the extent of cross-examination of a witness as to credibility is not subject to reversal absent a clear abuse of discretion. *See Cantu v. State*, 939 S.W.2d 627, 635 (Tex.Crim.App.), *cert. denied,* —— U.S.

——, 118 S.Ct. 557, 139 L.Ed.2d 399 (1997).

■■■ Here, the trial court apparently limited cross-examination on the grounds that the defense counsel had previously introduced other pictures of guns into the record, about which he was permitted to cross-examine Clark. The trial court was entitled to find that the introduction of further pictures would be cumulative and needlessly repetitive. We therefore hold that appellant has failed to demonstrate that the trial court abused its discretion in restricting the cross-examination of Larry Clark, and overrule appellant's eighteenth issue on appeal.

In his nineteenth issue on appeal, Cantu argues that the trial court erroneously admitted the expert opinion of Calvin Story, a forensic firearms examiner, as to whether .38 casings found at the scene would produce the chemical elements that were found on Cantu's hands. Defense counsel objected, arguing that Story was only qualified as an expert on ballistics, not on chemical analysis. The trial court stated that Story could respond if he knew the answer to the question. Story then gave his opinion that one would expect to find trace amounts of antimony, barium, and lead on the hands of someone who fired a gun using shells from the Blazer model of CCI brand ammunition, the type of shells recovered from the .38 revolver found at the murder scene.

■■■ "To preserve error for review a defendant must receive an adverse ruling on his objection." *Ramirez v. State*, 815 S.W.2d 636, 643 (Tex.Crim.App.1991). The State argues that appellant waived any error by failing to obtain an adverse ruling. We disagree. Here, the objection was that Story was not qualified as an expert to answer questions about various chemicals present in gunpowder. A court's ruling on a complaint or objection can be impliedly rather than expressly made. *See Rey v. State*, 897 S.W.2d 333, 336 (Tex.Crim.App.1995); *see also* Tex.

R.App. P. 33.1(a)(2)(A). In stating that Story could answer the question if he knew, the trial court implicitly overruled appellant's objection that he was not qualified to answer the question. We will therefore address the merits of appellant's argument.

▉ In allowing Story to testify about the chemical composition of different types of gunpowder, the trial court made an implicit determination that his expert testimony would help the jury to understand the evidence. *See* Tex.R. Evid. 702. The trial court's decision may not be disturbed on appeal absent an abuse of discretion. *See Alvarado v. State*, 912 S.W.2d 199, 216 (Tex.Crim.App.1995). While appellant argues that Story was only certified as a ballistics expert, Story's expertise was not specifically limited to ballistics. Story testified that he had fourteen years' experience with the Austin Police Department as a forensics firearm examiner, and his testimony demonstrated that he had extensive knowledge of and experience with ammunition and gunpowder. He explained to the jury the differences between various priming compounds and gave reasons for the presence or absence of certain compounds in different brands and models of ammunition. Specifically, Story testified that the Blazer line of CCI ammunition, which was murder weapon was shown to have fired, uses "the dirtiest powder that CCI puts in any of their cartridges," and contains antimony, barium, and lead. In conjunction with the test results showing traces of these elements on appellant's hands, the trial court was entitled to conclude that Story's experience would equip him to make judgments about the chemical compounds in ammunition with greater accuracy, even if only marginally so, than laypersons confronted with the same underlying data. *See Amos v. State*, 819 S.W.2d 156, 164 (Tex.Crim.App.1991). No abuse of discretion has been shown. We overrule appellant's nineteenth issue.

In his twentieth issue, appellant complains that the trial court improperly allowed Story to testify as to what characteristics of a handgun are most memorable to people. Story testified in cross-examination that a person familiar with guns standing in Larry Clark's approximate position relative to appellant in the carport should not mistake a .38 caliber for a .22 caliber revolver. On redirect, the State asked Story what characteristics of a gun would he expect a person to focus on and remember if that person were standing in the position of Larry Clark and seeing a gun. Over objection that the question called for speculation, Story responded: "The color, the size, the physical size, and whether or not it's a revolver or semi-automatic."

▉ On appeal, Cantu claims that Story was not qualified as an expert to give this opinion, that the opinion was speculation, and that the opinion was not shown to be relevant to assist the jury in their fact-finding. Defense counsel's objection at trial was, "Your Honor, I'm going to object to that question as total speculation. Expert though he may be, he can't know what some other person is focusing on." The State argues that Cantu waived any error because his objection did not sufficiently apprize the trial court or the State that appellant was challenging the scientific validity of the evidence. We will assume without deciding that appellant's objection was sufficient to preserve error; however, we disagree that the prosecutor's question called for speculation. The State merely asked Story to explain what attributes about a weapon he would expect *a person familiar with guns* to remember; he did not attempt to state, nor was he asked, what attributes *Larry Clark* would remember. We believe that the question asked calls for an answer well within the witness's general firearms expertise.

▉ Even if this were not the case, however, appellant has waived this issue on appeal. The State's question was designed to rebut the impression that appellant's counsel gave during Story's cross-

examination, which was that it was unlikely that Clark could have been mistaken about the caliber of appellant's gun. Appellant cannot open the door to this testimony in cross-examination and then object to it on grounds that it is not within the witness's expertise. *See Taylor v. State,* 819 S.W.2d 248, 250 (Tex.App.—Waco 1991, no pet.). Because error is waived, we will not address this issue on appeal.

In his twenty-first issue on appeal, Cantu argues that the trial court erred in admitting two autopsy photographs of Lydia Perez. At trial, defense counsel objected to admission of the photographs on the grounds that they were unduly graphic and not particularly probative. The State countered that the pictures showed the bullet and its trajectory. The trial court overruled the objection and admitted the photographs, thereby allowing the jury to examine them while deliberating. However, he warned the jury that the pictures were graphic, and suggested that some members of the jury might prefer not to look at them.

▮▮▮ Once a defendant objects to photographic evidence, the trial court must weigh the probative value of the photographs against the potential for unfair prejudice. *See Narvaiz v. State,* 840 S.W.2d 415, 429 (Tex.Crim.App.1992). In evaluating probative value against unfair prejudice, the trial court must consider the tendency of the evidence to resolve material issues on an emotional basis and balance that tendency against the host of factors affecting probativeness, such as the weight of the evidence and the degree to which its proponent might be disadvantaged without it. *See Fuller v. State,* 829 S.W.2d 191, 206 (Tex.Crim.App.1992).

▮▮▮ One of the photographs shows the side of the victim's brain, after it was exposed or removed, with a bullet lodged in it. The second shows the victim from her shoulders to her head, facing forward. The trial court did not indicate why he thought the pictures should be admitted,

only that "[t]he Court feels they ought to be admitted as part of the evidence and record of the case." We are not persuaded that the danger of unfair prejudice substantially outweighed any probative value the pictures may have carried. Only a few autopsy pictures were admitted, and they were not cumulative. The medical examiner used the pictures to help explain the victim's fatal injury. The trial court may have determined that the pictures were probative to clarify the medical examiner's testimony. The photographs "are not, in our estimation, so horrifying or appalling that a juror of normal sensitivity would necessarily encounter difficulty rationally deciding the critical issues of this case after viewing them." *Fuller,* 829 S.W.2d at 206. We cannot say that the trial court abused its discretion in admitting them. Appellant's twenty-first issue is overruled.

*Dr. Ezell's Testimony*

Cantu raises twelve issues on appeal regarding the admission of Dr. Jeff Ezell's testimony in the punishment phase of his trial. It is his contention that the admission of Dr. Ezell's testimony violated his rights under the Fifth, Sixth, and Fourteenth Amendments of the federal constitution; Article I, sections 10 and 19 of the Texas Constitution; and section 54.09 of the Texas Family Code.

▮▮▮ We first note that Cantu has waived all of his state law claims on appeal. As the State correctly observes, defense counsel never raised the issue of state constitutional requirements at trial. Appellant argues that he invoked the Texas Constitution in his motion in limine. However, a motion in limine alone does not preserve error for review. *See Harrington v. State,* 547 S.W.2d 616, 620 (Tex.Crim.App.1977). Error presented for review on appeal must comport with the objection raised at trial. *See Goff v. State,* 931 S.W.2d 537, 551 (Tex.Crim.App.1996), *cert. denied,* 520 U.S. 1171, 117 S.Ct. 1438, 137 L.Ed.2d 545 (1997). In the trial court,

defense counsel relied exclusively on *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), a federal case construing the Fifth and Sixth Amendments to the U.S. Constitution, in arguing for the exclusion of Dr. Ezell's testimony. Thus, no state constitutional claims have been preserved for review.

 Similarly, appellant has failed to preserve his state statutory claim for review. Appellant contends that he impliedly invoked the Texas Family Code when he argued before the court: "And that also brings up the interesting issue as to whether the waiver is valid at the time because he's not been certified as an adult at that time. And he requires special Mirandizing and magistration before any questioning begins." We find that this statement was too general to have alerted the trial court that defense counsel was invoking section 54.09 of the Texas Family Code, which enumerates certain rights for juvenile offenders. There is no indication from the record that the trial judge understood that the state statute was an authority for defense counsel's objection to the evidence.[8] Moreover, the statement was made in the context of an argument that

specifically identified federal law grounds for excluding Dr. Ezell's testimony. We conclude that defense counsel did not adequately preserve his state statutory grounds for review on appeal.

We now examine appellant's federal claims. Cantu contends that the admission of Dr. Ezell's testimony violated his right to be silent and his right to counsel under the Fifth, Sixth, and Fourteenth Amendments to the federal constitution. Dr. Ezell's testimony was based on a diagnostic evaluation ordered by the juvenile court to determine whether Cantu should be certified as an adult. *See* Tex. Family Code Ann. § 54.09(d) (West 1996). In the penalty phase of the trial, Dr. Ezell testified that Cantu had been evasive and not forthcoming during his evaluation. He diagnosed him with anti-social personality disorder,[9] although he acknowledged that American Psychiatric Association guidelines do not allow this diagnosis for persons under the age of eighteen. He observed that Cantu gave no indication of remorse for his misconduct, and did not admit to having committed the crime. Dr. Ezell concluded that Cantu was highly

---

**8.** In ruling that the testimony was admissible, the trial court said: "I reviewed the magistrate's warnings. Taken that in conjunction with the warnings given by the psychiatrist in this case, I feel it substantially complies with *Estelle v. Smith* [sic]. The objection to the testimony will be overruled."

**9.** Dr. Ezell explained anti-social personality disorder as being synonymous with a "psychopath" or a "sadistic sociopath," and defined the terms:

> In terms of dealing with the sociopathic, or anti-social disorder, we're talking about an individual who has a pervasive persistent pattern of disregard for and violation of the rights of others. These individuals may engage in repeated criminal behaviors, may have irritable and aggressive temperaments and behavior. May engage in overt, reckless disregard for the safety and well-being of others, as well as of themselves. They may put themselves in danger at the risk of their behavior as well. They tend to be dishonest, taunting, manipulative, deceitful.

They lack remorse. You can see these individuals fundamentally lack a conscience. So they have no remorse for their wrongdoing. They tend to be irresponsible as far as following through their commitments. They have unstable patterns of work and child-rearing, and so forth. They don't responsibly carry through with what we understand to be the normal responsibilities of adulthood.

> So out of that description a sociopath, or anti-social personality disorder, is going to have at least several of those characteristics. In terms of the sadistic element we're talking about a variety. Sociopath or psychopath that actively enjoys the suffering of others. Individuals who use the suffering and discomfort or pain of others to grandize [sic] themselves. These are individuals like power rapists are the idea that individuals who rape rape for dominance and power. That's that sadistic kind of element. We can think of the sadistic element as a very driven kind of aggression, that is, an aggression for enjoyment and for control and dominance.

likely to commit aggressive, dangerous acts in the future.

Cantu argues that the diagnostic evaluation was a compelled, in-custody examination, and therefore, the principles of *Estelle v. Smith* dictate that the protections of the Fifth and Sixth Amendments apply. In *Estelle*, the United States Supreme Court held that the admission of psychiatric testimony from a court-ordered pretrial competency examination in the penalty phase of a capital case violated the defendant's Fifth Amendment privilege against self-incrimination and Sixth Amendment right to counsel. *See Estelle*, 451 U.S. at 473, 101 S.Ct. 1866. The Court found that although the competency exam itself was a neutral proceeding, when the psychiatrist

> went beyond simply reporting to the court on the issue of competence and testified for the prosecution at the penalty phase on the crucial issue of respondent's future dangerousness, his role changed and became essentially like that of an agent of the State recounting unwarned statements made in a postarrest custodial setting.

*Id.* at 467, 101 S.Ct. 1866. The Court found it significant that the defendant in that case "was given no indication that the compulsory examination would be used to gather evidence necessary to decide whether, if convicted, he should be sentenced to death." *Id.*

Relying on *Estelle*, appellant argues that the admission of Dr. Ezell's testimony violated his Fifth Amendment right to silence because (1) the diagnostic exam was a custodial interrogation; (2) the testimony was based on his statements, which were compelled, and therefore not voluntary; (3) Dr. Ezell commented on appellant's invocation of his right to silence during the diagnostic exam; (4) Dr. Ezell commented on appellant's apparent lack of remorse during the diagnostic exam; and (5) Dr. Ezell commented on appellant's demeanor during the diagnostic exam. Appellant also contends that the admission of Dr.

Ezell's testimony violated his Sixth Amendment right to counsel.

The State argues that appellant knowingly and voluntarily waived his right to not incriminate himself. In support of this claim, the State cites the facts that appellant received the magistrate judge's warnings in open court and in the presence of his attorney; that appellant's attorney told Dr. Ezell he had counseled appellant about the diagnostic evaluation; and that appellant appeared "comfortable" and "unperturbed" during the interview. Moreover, the State notes that Dr. Ezell testified that appellant understood his rights; that there was no indication he misunderstood his rights; that there was no evidence of compulsion or undue pressure in the exam; and that there was no manifestation of appellant's desire to terminate the interview.

■ The State's argument misses the essential thrust of appellant's claim, which is that he was not warned prior to the diagnostic exam that his testimony could be used against him *at trial*. The magistrate's warnings advised appellant generally that statements made during the diagnostic exam could be used in evidence against him. But the purpose of the diagnostic exam was to provide evidence for the *certification hearing*. Once it exceeded its intended purpose and became the source of incriminating evidence against appellant, the exam constituted a custodial interrogation to which Fifth Amendment protections applied. *Cf. Hidalgo v. State*, 983 S.W.2d 746, 756 (Tex.Crim.App.1999) (inquiries into facts of offense and prior criminal experiences during course of psychiatric examination permissible if not intended to force juveniles to supply self-incriminating evidence).

■ In *Estelle*, the United States Supreme Court observed that, "absent other fully effective procedures, a person in custody must receive certain warnings before any official interrogation, including that he has the 'right to remain silent' and that

'anything said can and will be used against the individual in court.'" *Estelle*, 451 U.S. at 466–67, 101 S.Ct. 1866. In reviewing the record, we find that appellant was not adequately informed of his Fifth Amendment rights with respect to the juvenile diagnostic exam. There is no evidence to suggest that appellant knew or reasonably should have known that his testimony during the diagnostic exam would be used against him in an adjudicatory proceeding.[10] Appellant's waiver of his rights was therefore ineffective. *See id.* at 469, 101 S.Ct. 1866 (psychiatric testimony "could be used as the State did at the penalty phase only if [the defendant] had been apprized of his rights and had knowingly decided to waive them"); *Huffman v. State*, 676 S.W.2d 677, 682 (Tex.App.—Houston [1st Dist.] 1984, pet. ref'd) (waiver of constitutional right must be done knowingly and intelligently with sufficient awareness of relevant circumstances and likely consequences) (quoting *Brady v. United States*, 397 U.S. 742, 748, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970)).

The State argues that *Estelle* only requires that the defendant be informed about the possible use of statements at punishment in capital cases, because the proceedings and rights at stake in a capital case are of greater magnitude than those in a non-capital case. In support of this contention, the State quotes the Court's statement in *Estelle*: "[W]e do not hold

that the same Fifth Amendment concerns are necessarily presented by all types of interviews and examinations that might be ordered or relied upon to inform a sentencing determination." *Estelle*, 451 U.S. at 469 n. 13, 101 S.Ct. 1866. We disagree that this statement provides a sufficient basis for distinguishing capital and non-capital cases. The comment seems clearly directed to the type of examinations that might warrant Fifth Amendment protections, not the type of punishment proceedings that might merit them.[11]

Appellant offers *Parker v. State*, 649 S.W.2d 46 (Tex.Crim.App.1983), as an example of a non-capital case that applies *Estelle*. The State contends that *Parker* never addressed the issue of whether *Estelle* should apply to non-capital cases. In an earlier proceeding of *Parker*, the court of criminal appeals affirmed a non-capital conviction, rejecting the contention that a psychiatrist should not have been permitted to testify as a witness on the issue of defendant's sanity at the guilt stage of trial. *See Parker v. State*, 594 S.W.2d 419, 422–23 (Tex.Crim.App.1980). The United States Supreme Court subsequently accepted the defendant's petition for certiorari, but then remanded the cause for further consideration in light of its ruling in *Estelle v. Smith*. *See Parker*, 649 S.W.2d at 47. On remand, the court of criminal appeals reaffirmed the conviction, holding

---

**10.** In voir dire, Dr. Ezell conceded that while he had warned appellant during the exam that he had a right to remain silent, he did not warn him specifically that anything he said could be used against him in a criminal trial as an adult. He also agreed that while appellant's attorney for the juvenile proceeding told him that appellant had been counseled, he had no factual knowledge of whether that counseling included informing appellant that statements made in the diagnostic exam could be used against him in a criminal trial. There is no evidence in the record to suggest that appellant's counsel knew Dr. Ezell could or would testify in a subsequent adult criminal proceeding.

**11.** In *Hidalgo v. State*, 983 S.W.2d 746 (Tex. Crim.App.1999), the court of criminal appeals

identified a strong policy reason behind affording these protections in a juvenile diagnostic exam, and restricting the ability to use information derived from the exam in an adjudicatory proceeding:

> Use of statements made in the exam [in] the juvenile's criminal prosecution disregards the rationale for the exam and effectively transforms the exam into a criminal investigation. Also, if juveniles can not be assured that their statements can not be used against them in future criminal prosecutions, they will not want to participate in the exam. As such, the juvenile court's ability to obtain all available information and to gather reliable evidence would be frustrated.

*Id.* at 756.

that *Estelle* does not apply absent a timely objection on the basis of the Fifth and Sixth Amendments. *See id.* The court of criminal appeals gave no indication that *Estelle* would otherwise be inapplicable to the case at bar. *See also Hidalgo v. State,* 983 S.W.2d 746, 753 (Tex.Crim.App.1999) (analyzing applicability of *Estelle* to juvenile diagnostic exam).

In our review of *Estelle v. Smith,* we can find no principled rationale for limiting its holding to capital cases. The Fifth Amendment concerns are identical, regardless of whether death or a possible life sentence is at issue. In *Estelle,* the Court observed: "The Fifth Amendment privilege is 'as broad as the mischief against which it seeks to guard,' and the privilege is fulfilled only when a criminal defendant is guaranteed the right 'to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty ... for such silence.'" 451 U.S. at 467–68, 101 S.Ct. 1866 (quoting *Counselman v. Hitchcock,* 142 U.S. 547, 562, 12 S.Ct. 195, 35 L.Ed. 1110 (1892), and *Malloy v. Hogan,* 378 U.S. 1, 8, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964)) (alterations in the original). We therefore hold that the admission of Dr. Ezell's testimony in the penalty phase violated appellant's Fifth Amendment right against self-incrimination because appellant was not advised before the psychiatric examination that he had the right to remain silent and that any statement he made could be used against him at the penalty phase.[12]

Appellant also argues the admission of Dr. Ezell's testimony violated his right to counsel under the Fifth and Sixth Amendment. The State contends that a juvenile has no right to have counsel present during a psychiatric examination. Furthermore, the State argues, Cantu clearly waived his rights based on his receipt of the magistrate's warnings, his attorneys' subsequent communications with Dr. Ezell, his own refusal to speak about the offense during the exam, and the fact that he never requested an attorney.

Cantu concedes that he had no right to have counsel present during the exam. *See Bennett v. State,* 766 S.W.2d 227, 231 (Tex.Crim.App.1989). Instead, he argues that he had a right to consult with counsel about the exam before it took place. As discussed above, the State cannot show in this case that Cantu knowingly waived his rights under the Fifth Amendment because there is no evidence that Cantu (or, for that matter, Cantu's counsel) was aware that the diagnostic exam might encompass an evaluation of his future dangerousness or other evidence to be presented in the penalty phase of the trial.

■ In *Hidalgo,* the court of criminal appeals held that the diagnostic exam does not by itself constitute a "critical stage" triggering Sixth Amendment protections. *See Hidalgo,* 983 S.W.2d at 755. However, the court appeared to restrict this holding to cases in which the only purpose of the exam was to provide a determination of whether the juvenile should be certified as an adult. *See id.* at 756 ("Failure to limit the query [into the offense or the juvenile's prior history] could lead to a violation of a juvenile's right against self-incrimination or right to counsel"). In the instant case, the diagnostic exam served a dual purpose. Dr. Ezell used it as the basis of both his determination that Cantu should be transferred to district court and his opinions introduced in the punishment phase at trial. Clearly, in this latter role, the diagnostic exam was a "critical stage" of the adversarial proceedings against

---

12. In *Estelle,* the United States Supreme Court stated that had the defendant in that case invoked his rights, the competency examination could have proceeded on the condition that the results would have been applied solely for the purpose of determining competency. *See Estelle,* 451 U.S. at 468–69,

101 S.Ct. 1866. Similarly, when a juvenile defendant invokes his rights not to have the content of a diagnostic exam used against him at trial, the diagnostic exam may proceed for the purposes of determining certification only.

Cantu warranting Sixth Amendment protections. *See Estelle,* 451 U.S. at 470, 101 S.Ct. 1866. Because the juvenile diagnostic exam proceeded in violation of appellant's Fifth and Sixth Amendment rights to counsel, we hold that the trial court erred in admitting Dr. Ezell's testimony.

■ Having found that the admission of Dr. Ezell's testimony constitutes constitutional error, we must reverse unless we determine beyond a reasonable doubt that the error did not contribute to the assessment of punishment. *See* Tex.R.App. P. 44.2(a). The burden is on the State to prove that the error made no contribution to punishment. *See Williams v. State,* 958 S.W.2d 186, 194 n. 9 (Tex.Crim.App.1997).

■ In addition to Dr. Ezell's testimony, the State offered the testimony of seven people, including two police officers, establishing appellant's bad character and violent nature. The State also offered evidence that appellant assaulted another inmate while in jail pending trial, and the testimony of Lydia Perez's brother, who said that appellant smiled at the victim's family after the verdict was announced during the guilt-innocence phase. Under the circumstances, we cannot conclude beyond a reasonable doubt that the jury did not given any weight to Dr. Ezell's inflammatory testimony. We therefore reverse the judgment with respect to the punishment phase only, and remand the cause to the trial court for a new punishment hearing. *See* Tex.Code Crim. Proc. Ann. art. 44.29(b) (West Supp.1999). Having concluded that the admission of Dr. Ezell's testimony warrants reversal of the assessment of punishment, we need not reach appellant's two remaining issues on appeal regarding error in the prosecutor's jury argument in the penalty phase.

### CONCLUSION

Because we overrule all of appellant's issues on appeal with respect to the guilt-innocence phase of his trial, we affirm the judgment with respect to the finding of guilt. Having determined that the juvenile diagnostic exam, if it were to be used in assessing punishment, proceeded in violation of appellant's Fifth and Sixth Amendment rights, we find that the trial court erred in admitting evidence from that psychiatric exam in the penalty phase. We therefore reverse the trial court's assessment of punishment and remand the cause to the trial court for a new punishment hearing.