Donald C. **HEIDELBERG**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 01-00-00133-CR.

Court of Appeals of Texas,
Houston (1st Dist.).

July 8, 2003.

Rehearing Overruled July 8, 2003.

Brian W. Wice, Houston, for Appellant.

William J. Delmore, III, Chief Prosecutor, Appellate Div., John B. Holmes, Dist. Atty., Houston, for Appellee.

Panel consists of Justices TAFT, BRISTER,* and DUGGAN.**

## OPINION ON REHEARING

TIM TAFT, Justice.

On June 21, 2001, we issued an opinion affirming the trial court's judgment. On July 9, 2001, appellant, Donald C. Heidelberg, filed a motion for rehearing and motion for en banc consideration.[1] The State filed a response on August 17, 2001. We overrule appellant's motion for rehearing, but substitute this opinion for our previous opinion. Our June 21, 2001 judgment, in which we affirmed appellant's conviction, remains unchanged.

A jury found appellant guilty of aggravated sexual assault of a child, and the trial court assessed punishment at 25 years in prison. Appellant raises eight points of error challenging (1) the trial court's allowing appellant and a deputy to be questioned concerning appellant's post-arrest silence, (2) the prosecutor's arguments commenting on appellant's post-arrest silence, (3) the prosecutor's argument outside the record, (4) the prosecutor's improper impeachment of a witness with a prior conviction, and (5) the prosecutor's improper impeachment of appellant's wife. We affirm.

## Facts

On December 26, 1998, the eight-year-old complainant, A.M., was staying with her mother at her mother's apartment. When A.M.'s mother went out, A.M.'s grandmother, who had remarried appellant, and appellant baby-sat A.M. During the night, appellant fondled A.M.'s private parts and penetrated her anus slightly with his penis.

## Post–Arrest Silence

In points of error one and two, appellant contends that the trial court erred in allowing the prosecutor to impeach appellant and to question Detective Fitzgerald about appellant's post-arrest silence.

* The Honorable Lee Duggan, Jr., retired Justice, Court of Appeals, First District of Texas at Houston, participating by assignment.

** The Honorable Scott Brister, who became Chief Justice of the Fourteenth Court of Appeals on July 16, 2001, continues to partici-

pate by assignment for the disposition of this case, which was submitted on March 26, 2001.

1. Appellant's points on rehearing address only the first four points of error concerning comments on appellant's post-arrest silence.

## A. Impeachment of Appellant

In his first point of error, appellant contends that the trial court's allowing the prosecutor to impeach appellant regarding his post-arrest silence violated his rights under article I, section 10 of the Texas Constitution.

### 1. The Factual Context

The prosecutor began her cross-examination of appellant by asking if appellant knew that Detective Fitzgerald (the detective investigating this offense) was trying to contact appellant. Defense counsel's objection that this went to his client's Fifth Amendment right, that appellant did not have to talk to anybody, was overruled. Appellant then admitted that he had returned a call to Detective Fitzgerald's office on January 14, but denied that he knew whose office it was and what the original call concerned.

The prosecutor then asked if appellant had asked to talk to the detective once appellant knew about the charges against him. When appellant said that he was incarcerated by that time, defense counsel renewed his Fifth Amendment objection, which the trial court overruled. When the prosecutor asked why appellant did not talk with the investigating officer to explain that A.M.'s allegations were false, appellant first said that he did not know that he had to talk to any detective about it, that he did request to talk to an attorney about it, and that, when he was arrested, he told the detectives about it. When the prosecutor pursued whether appellant ever attempted to contact the detective in this case, appellant first said that he did and then explained that he did not know whether the persons to whom he had been talking were the ones in charge of the case. He guessed that they were. The prosecutor finished by eliciting that appellant never expressed whether he wanted to talk to the detective who was handling the case.

On redirect examination, appellant testified that, ever since he had found out about the allegations, he had wanted to tell someone in authority, but it seemed like everybody was trying to suppress the truth that he wanted to be known. When he was asking for a detective, he was asking to tell someone. When he was being questioned during processing, he thought that he was talking to the detective who was informing him of the charges.

On recross-examination, appellant stated that he thought that he was being interviewed by a child-abuse detective during processing into the jail.

### 2. The Law

■ A defendant's pre-arrest silence is admissible. *Waldo v. State*, 746 S.W.2d 750, 755 (Tex.Crim.App.1988). Regarding post-arrest silence, the Texas Constitution is more protective of a defendant's rights than the federal constitution. The Fifth Amendment only protects a defendant from having his post-arrest silence that occurs *after the administration of his warnings against self-incrimination* used against him. *Doyle v. Ohio*, 426 U.S. 610, 618, 96 S.Ct. 2240, 2245, 49 L.Ed.2d 91 (1976). Article I, section 10 of the Texas Constitution protects a defendant from having his post-arrest silence that occurs *before or after warnings have been administered* used against him. *Sanchez v. State*, 707 S.W.2d 575, 582 (Tex.Crim.App. 1986).

### 3. Preservation

■ Here, appellant objected to the use of both his pre-arrest and post-arrest silence, but only under the Fifth Amendment. He does not renew those Fifth

Amendment objections on appeal.[2] Rather, he asserts that article I, section 10 of the Texas Constitution prohibited the use of his silence against him. Appellant failed to make any objection at trial based on the Texas Constitution, however. Therefore, appellant did not preserve his first point of error for review.[3] *See Barnum v. State,* 7 S.W.3d 782, 789–94 (Tex. App.-Amarillo 1999, pet. ref'd) (holding that appellant did not preserve state constitutional violation of right to confrontation when only constitution invoked in trial objection was federal); *Cantu v. State,* 994 S.W.2d 721, 732–33 (Tex.App.-Austin 1999), *pet. dism'd, improvidently granted,* 19 S.W.3d 436 (Tex.Crim.App.2000) (holding that state constitutional claims not preserved when only objection at trial was federal case construing federal constitution).

The dissenting opinion relies upon two cases for the proposition that a Fifth Amendment trial objection suffices to preserve an article I, section 10 appellate challenge. Both cases are distinguishable. In *Veteto v. State,* 8 S.W.3d 805 (Tex.App.-Waco 2000, pet. ref'd), the trial court *sustained* defense objections at trial, based primarily on the Fifth Amendment, and instructed the jury to disregard because "post-arrest silence" was not evidence. *Id.* at 809–10. No distinction was made at trial or on appeal between the differing scopes of protection under the state and federal constitutions. *Id.* at 809–11. Given the parties' and trial court's discussion, the court of appeals concluded that it was "clear" that everyone understood appel-

lant's objection to have been to all post-arrest silence, not just to that post-arrest silence occurring after warnings. *Id.* at 810–11. In *Cabrales v. State,* 932 S.W.2d 653 (Tex.App.-Houston [14th Dist.] 1996, no pet.), defense objections at trial—referring to the silence as having been "custodial" and having occurred while "under arrest," without mentioning the Fifth Amendment—were held to alert the trial court sufficiently that the prosecutor was improperly discussing the defendant's post-arrest silence, again without making any distinction between the scope of protection under the state and federal constitutions. *Id.* at 659–61. The proposition for which these two cases stand is that a trial objection invoking the right to remain silent after arrest, even when reference is made to the Fifth Amendment, is sufficient to preserve an appellate claim that the prosecutor commented on a defendant's right to post-arrest silence. The two cases do not stand for the proposition that an objection solely under the Fifth Amendment, without more, preserves a complaint that the prosecutor commented on a defendant's right to **pre-*Miranda,*** post-arrest silence, which is the right protected by the state constitution.

Because appellant did not preserve his first point of error by making a trial objection invoking his state constitutional right, we overrule appellant's first point of error.

### B. Detective Fitzgerald's Testimony

In his second point of error, appellant contends that the trial court's allowing the

**2.** We note that appellant could not have prevailed on his Fifth Amendment challenges even if he renewed them on appeal: there is nothing in the record about appellant's having received warnings, and the Fifth Amendment does not protect silence either before arrest or after arrest, but after the administration of warnings. *See Doyle v. Ohio,* 426 U.S.

610, 618, 96 S.Ct. 2240, 2245, 49 L.Ed.2d 91 (1976).

**3.** We note that, even if appellant had preserved this complaint, article I, section 10 would not have applied to appellant's pre-arrest silence. *See Sanchez v. State,* 707 S.W.2d 575, 582 (Tex.Crim.App.1986).

prosecutor to elicit testimony from Detective Fitzgerald regarding appellant's post-arrest silence violated his rights under article I, section 10 of the Texas Constitution.

### 1. The Factual Context

The prosecutor began her questioning with Detective Fitzgerald's attempts to contact appellant to get his side of the story. Defense counsel first objected, once again based only on appellant's Fifth Amendment right, to Detective Fitzgerald's answer that he was able to make contact with appellant "in a way." The trial court overruled the objection. Defense counsel then asked for a "standing objection," which the trial court granted. The testimony then concentrated on several attempts that Detective Fitzgerald had made, prior to appellant's arrest, to contact appellant and appellant's attempts to call back. The only arguably objectionable question and answer revealed that Detective Fitzgerald would have sat down and spoken with appellant if appellant had wanted to talk to the detective after appellant was arrested, the apparent inference being that appellant did not seek out Detective Fitzgerald to tell his side of the story.

### 2. Preservation

■ For the same reason that appellant did not preserve his first point of error, he did not preserve his second point of error. Appellant's Fifth Amendment objection is not sufficient to preserve his complaint on appeal to post-arrest, pre-warning silence.

■ There is also a second reason that appellant's "standing objection" was insufficient to preserve error. When defense counsel made the standing objection, the prosecutor was asking questions pertaining to the time period prior to appellant's arrest. Later, the prosecutor did ask indirectly about appellant's post-arrest

silence. Therefore, appellant's standing objection eventually applied to comments on appellant's silence both pre- and post-arrest, most of which were admissible, and only one of which was inadmissible. An objection to testimony containing both admissible and inadmissible matters, which objection fails to specify the particular matters that are inadmissible, is insufficient to preserve error. *See* TEX.R. EVID. 105(a). Accordingly, we overrule appellant's second point of error.

### Arguments Commenting on Post–Arrest Silence

■ In points of error three and four, appellant contends that the trial court erred in overruling appellant's objections to several arguments by the prosecutor commenting on appellant's post-arrest silence. As with appellant's first two points of error, defense counsel began objecting when the prosecutor was arguing about pre-arrest silence and continued to object when the prosecutor argued concerning post-arrest silence. Also, defense counsel's trial objections invoked only the Fifth Amendment. On appeal, appellant argues based only on the Texas Constitution. Accordingly, for the same reasons stated in points of error one and two, appellant failed to preserve error in regard to any comments on his post-arrest silence under the Texas Constitution. We overrule appellant's points of error three and four.

### Argument Outside the Record

In points of error five and six, appellant raises two instances in which the trial court erred in allowing the prosecutor to argue outside the record.

■ Regarding point of error five, appellant's counsel invited the argument by arguing that the absence of previous sexual assault charges against appellant made

it unlikely that he was the perpetrator in this case. In response, the prosecutor argued that the current offense may not have been appellant's first sexual assault. We agree with the State that the prosecutor was entitled to respond to appellant's argument, which was likewise outside the record. *See Vigneault v. State*, 600 S.W.2d 318, 329 (Tex.Crim.App.1980). We overrule point of error five.

■ Regarding point of error six, the trial court responded to appellant's objection by stating, "Ladies and gentlemen, you'll take the evidence from the witness stand, the witness stand alone." Because appellant did not obtain an adverse ruling from the trial court, appellant did not preserve his complaint for appeal. *See* Tex. R.App. P. 33.1(a)(2). We overrule point of error six.

### Improper Impeachment

■ In point of error seven, appellant contends that the trial court erred in allowing the prosecutor to impeach a witness with a prior conviction as to which probation had been satisfactorily completed. *See* Tex.R. Evid. 609(c)(2). We do not reach the merits of this point, however, because appellant did not object at trial on this ground. Instead, appellant objected on the basis that more than 10 years had elapsed since the prior conviction. *See* Tex.R. Evid. 609(b). Error is not preserved when the trial objection differs from the appellate complaint. *Chambers v. State*, 903 S.W.2d 21, 32 (Tex.Crim.App. 1995). Accordingly, we overrule point of error seven.

### Impeachment of Appellant's Wife

■ In point of error eight, appellant contends that the trial court erred in allowing the prosecutor to impeach Vernee Roberson, who is appellant's wife and the complainant's grandmother. After Rober-

son testified on appellant's behalf, the prosecutor asked her if she had ever smoked marihuana in front of the complainant. Appellant claims that this question violated Texas Rule of Evidence 608(b), prohibiting inquiry about specific prior acts of a witness to attack credibility. Tex.R. Evid. 608(b).

At trial, the complainant's parents testified to appellant's guilt, and the complainant's grandparents (including appellant) testified to his innocence. After the impeachment of which appellant complains, in cross-examining one of the State's witnesses, appellant's counsel introduced testimony that the complainant's father believed that the complainant's mother "did drugs, smoked pot, drank, [and] ran the streets." To counter this attack on the complainant's mother, the State got the same witness to testify that the victim's father believed that the victim's grandmother did much the same. Appellant does not complain on appeal of the later admission of the same evidence to which he objects in this point of error. Any error was rendered harmless by the admission of the same evidence elsewhere. *See Ethington v. State*, 819 S.W.2d 854, 858–59 (Tex.Crim.App.1991). Accordingly, we overrule point of error eight.

### Conclusion

We affirm the trial court's judgment.

Appellant moved for rehearing and for en banc consideration on rehearing.

A majority of the justices of the Court voted to deny en banc consideration on rehearing.

Justice LEE DUGGAN, JR., dissenting from the judgment and dissenting to the denial of en banc consideration on rehearing.

LEE DUGGAN, JR., Justice dissenting.

I respectfully dissent. I would hold that appellant preserved error in his points one, two, and four, all concerning his right to post-arrest silence.

### Preliminary Statement

I believe that the majority's summary of facts and jury argument is overly condensed and omits vast portions of the record that bear on how the jury would evaluate the critical issue of credibility of the complainant and appellant. Therefore, I submit the following as an examination of "the entire record in a neutral, impartial and even-handed manner." *Barnum v. State*, 7 S.W.3d 782, 793 (Tex.App.-Amarillo 1999, pet. ref'd) (citing *Harris v. State*, 790 S.W.2d 568, 586 (Tex.Crim.App.1989)).

### Facts

In December 1998, the eight-year-old complainant, whose parents were divorced, lived with her father, Derek, his then fiancée, Rae Jean, and Rae Jean's two children. The complainant spent Christmas evening and December 26 with her mother, Shannon, at Shannon's one-bedroom apartment. Shannon's mother, Vernee, and appellant, Shannon's 47–year–old stepfather, lived in the same apartment complex and frequently baby sat the complainant and Vernee's other grandchildren. On December 26, Shannon went out late at night and left the complainant in her apartment in the care of Vernee and appellant, as she had done on many occasions. Vernee and appellant testified that they watched television with the complainant in the living room until about 10 p.m., when the complainant went into the bedroom to go to sleep. The complainant testified that she did not watch television with the two adults before going to bed. Shannon testified that she did not go out until after 11 p.m., after she put the complainant to bed.

Vernee and appellant testified that they continued to watch television until they went to sleep in the living room.

### The State's testimony—the complainant

The complainant testified as follows. As she lay in bed in the bedroom, pretending to be asleep, she heard appellant come from the living room through the bedroom, go to the adjoining bathroom, relieve himself, and return through the bedroom to the living room. Shortly afterward, while she still pretended to be asleep, he returned to the bedroom a second time, closed the door to the living room, pulled down her underwear, touched her genitals and anus with his hand, pulled her underwear back up, and left the bedroom. He returned to the bedroom a third time, fondled her private parts, and returned to the living room. He returned a fourth time, and she heard him unzip and pull down his pants. She felt him press his penis against her anus, and penetrate her "a little bit." She felt something wet. He got toilet paper from the bathroom, wiped the complainant's private area, and returned to the living room. Neither she nor appellant spoke during any of the four times he came into the bedroom. The next morning, December 27, she told her mother, Shannon, only that appellant had fondled her.

Later that day, Shannon told her mother, Vernee, what the complainant had told her, but did not confront appellant about it. Shannon returned the complainant to her father's house that afternoon, where the complainant told the full account to Rae Jean's 12–year–old daughter and then to Rae Jean. When the complainant's father, Derek, returned home from work that night, Rae Jean told him and he telephoned the police.

On December 29, the complainant was taken to the Children's Assessment Center, where she was examined by Dr. Mar-

garet McNeese, the facility's director, a pediatrician who specializes in the diagnosis and treatment of child abuse.

### The State's testimony—Dr. NcNeese

Dr. McNeese testified that under her questioning, the complainant said that "[t]he reason I'm here is because of my paw-paw"; "that he touched me in spots where he shouldn't have touched me," with "[h]is hand and penis" once; and that it happened "Saturday night." Dr. McNeese testified that a rape kit examination of the complainant was negative, which was reasonable to expect 48 to 72 hours after such an event. Dr. McNeese examined the complainant and found, under magnification, a decreased stellate pattern of skin folds in the complainant's rectal area, often seen when a child is an unwilling participant in anal intercourse, and which usually disappears within 72 hours.

### The State's testimony—Rae Jean

Rae Jean, the complainant's father's fiancée at the time, testified that she first felt something was wrong when Shannon brought the complainant home on December 27, but did not come inside to help the complainant get situated, as she had always done before. Instead, Shannon simply came in, dropped off the complainant's things, and left without talking to Rae Jean. Rae Jean first saw the complainant that evening in Rae Jean's daughter's room, where the complainant's demeanor "was unlike I had ever seen before . . . she was extremely upset . . . she was very scared, she was crying . . . she was shaking. She was out of the norm."

Rae Jean's account of what the complainant told her was consistent with the complainant's earlier testimony of events, except that the complainant told her nothing about appellant's orgasm or "anything wet happening around her when he was done." Rae Jean testified that "the way she was, I knew from my gut, . . . that

child was not lying." Rae Jean told Derek, the complainant's father, of the complainant's statement when he returned home that night, and he became "very upset" and telephoned the police. Child Protective Services ("CPS") came and took the complainant to the doctor on December 29.

In Rae Jean's opinion, the complainant often did not tell her things that went on at her mother's house because "she is afraid that her father would get angry and not allow her to go over." The complainant is close to her mother, enjoys being with her, and is "very protective of her mother." Shannon usually came for the complainant "about once every two to three weeks," depending on her schedule and whether she wanted the complainant or not. The complainant complained to Rae Jean about being left with other people while she was visiting at her mother's apartment, and told Rae Jean it upset her "because she went there to be with her mom and her mom was not there." Derek disapproved of the complainant's grandmother Vernee's lifestyle because "she did drugs and ran the streets."

### State's testimony—Detective Fitzgerald

Harris County Deputy Sheriff James P. Fitzgerald, a detective assigned to the Children's Assessment Center, testified about the routine of checks and inquiries conducted when CPS refers a complaint of a family-related sexual assault of a child to the Assessment Center. The child is brought to the Center and questioned by a specially trained forensic interviewer in a "nonleading" and "very innocuous" manner. If the child mentions abuse, they "zoom in on that and work it." A statement is taken from the victim, a medical exam is done at the clinic in the same building, and other witnesses "who might have knowledge of the situation" are then interviewed, including the suspect.

Fitzgerald testified that, typically, the defendant is given an opportunity to speak because the child "may be telling us a story," and "the defendant is the best source of information as to why this child would be telling a lie about him, making up a story." It is fairly common "that an offense occurs with someone in the next room."

On cross-examination, Fitzgerald testified that the original report the Assessment Center received from CPS was of "a touching incident with no penetration," that he therefore did not attempt to get the bed sheets to check for semen, and that he believed, but was unsure (and thus did not put in his report), that the sheets had been changed. He agreed with appellant's attorney that semen might indeed be on the sheets if they had not been changed, and that evidence of semen, if it had been found, would directly link someone to the offense.

### The State's testimony—Shannon

The State did not call Shannon, the complainant's mother, as a witness until the State's rebuttal. She testified that several months after their divorce she asked Derek, her former husband and the complainant's father, to take the complainant to live with him because she, Shannon, was having "a lot of problems" with her mother, Vernee, with whom she and the complainant were staying. On December 26, she made arrangements at about 10 p.m. to go out, and left her apartment about midnight, leaving the complainant with appellant and Vernee. There had never been any problems between the complainant and appellant before, and the two had "a good relationship." Shannon stated she put the complainant to bed before she left and that the complainant was not watching television with the two adults when she left. When Shannon returned, Vernee was asleep on the living room couch and appellant was asleep on the living room floor. She went into the bedroom, and the complainant was awake. When Shannon undressed and got into bed, the complainant said, "you know, I have something to tell you." She said "what is it?" The trial court sustained appellant's objection and prevented Shannon's response.[1] The next day, Shannon testified, she observed a different, more subdued, manner that appellant and the complainant showed toward each other, a manner that was so contrary to the usual light-heartedness between them.

### The Defense testimony—Vernee

Vernee, the complainant's maternal grandmother, testified (1) that she was still married to, but separated from, appellant and (2) that "we're friends right now," but that she is dating someone else. Vernee also testified that since her marriage to appellant in 1994, (1) appellant has baby sat the complainant and Vernee's other grandchildren alone "plenty of times," (2) the complainant "has lied about things" and "loves attention," (3) the complainant wants to live with Shannon, (4) the complainant has become upset with Shannon on occasions for "going out while she is [visiting at the apartment] with her," and (5) Shannon kept X-rated videos in the apartment before the incident.

---

1. The State filed a pre-trial "Notice of Intention to Use Child Abuse Victim's Hearsay Statement" for both Shannon and Rae Jean. TEX.CODE CRIM. PROC. ANN. art. 38.072 (Vernon 2003). The complainant's statement to Shannon recounted only the offense of indecency with a child. The complainant's statement to Rae Jean related the offense of aggravated sexual abuse of a child. Appellant filed a "Motion for Hearing prior to Jury Selection to Determine the Admissibility of Outcry Witness Testimony" pursuant to *Garcia v. State,* 792 S.W.2d 88 (Tex.Crim.App.1990) (holding that only one outcry witness's testimony is authorized). The trial court admitted Rae Jean's outcry testimony.

Vernee testified that on the evening in question, she and appellant had one beer apiece and shared a half cup of brandy, but neither was intoxicated. They came over to Shannon's apartment on short notice to sit with the complainant when Shannon decided late to go out. Before Shannon left, they watched, along with the complainant, a television special on JonBenet Ramsey ("she was raped and molested, or whatever, or strangled, you know. They found her in her mother's house in the basement or wherever."). The complainant went to bed before Shannon left at about 11 p.m. Vernee and appellant continued to watch television after the complainant went to the bedroom to go to sleep.

Appellant went through the bedroom to the bathroom and was out of Vernee's presence only "[a] minute, long enough to go to the bathroom and come back." Appellant went to sleep on the living room floor, and she slept on the living room couch. Vernee is not a heavy sleeper, and she heard nothing going on. She does not believe "what [the complainant] said happened really happened." Appellant fell asleep before she did, and she continued to watch television. "I got up and went to the bathroom several times myself and he was still laying there sleep [sic] snoring . . . on the floor." Shannon came home between 3:30 and 4:00 a.m. Vernee was present with the complainant and Shannon the next morning, and the complainant never said anything in her presence about appellant; there was nothing unusual about the complainant's demeanor. The complainant "never hesitates to tell anyone what's on her mind," and she never told Vernee "anything was going on with her grandfather." Shannon told Vernee about the allegations the next day. Vernee has never spoken to the complainant about the event, but did speak with appellant and told him words to the effect that "I don't know why this is being said or whatever

because I was right there, you know, the whole time . . . and as far as what I heard was going on, there's no way none of that could have happened while I was standing there."

Vernee acknowledged that she had smoked marihuana in front of the complainant, but denied that she had ever told Shannon, her daughter, to tell the complainant not to testify. She testified that Shannon was molested as a child in California by Shannon's own step-grandfather ("my mother's husband") and that when she, Vernee, learned of it years later, she did not encourage Shannon then to go to the police. She does not know whether the complainant knew of that incident of molestation.

**The Defense testimony—appellant**

Appellant emphatically denied the complainant's charges. He testified that he never sexually abused or improperly touched "her or any other child. I'm not a child abuser, I'm not a child molester. I'm not any kind of perverted person." He was "shocked" and "upset" at the charges. He has known Shannon since 1993, and his relationship with her was good before December 26, 1998. He said it was normal for him to take care of Shannon's daughter, and he watched her for Shannon "quite often." He had earlier continued to live with Shannon while he and Shannon's mother, Vernee, were separated from May to September 1998.

Appellant testified that after Shannon returned to the apartment early on December 27, he and Vernee left about 4:30 or 5:00 a.m. and returned to their own apartment. Everything was normal the next day, and Shannon did not ask him anything about what the complainant might have said to her. He has no ill feelings toward the complainant, and he understands "what [she] has been going

through since I've known her, the five or six years I've known her. For a child of her age, she has gone through quite a bit, quite a bit."

This concluded appellant's direct-examination testimony. The State's cross-examination, which followed immediately, was directed solely to the subject of appellant's failure to talk to Detective Fitzgerald, with a substantial portion of the State's questions focused on appellant's post-arrest silence.

## Preservation of Error

Appellant's trial counsel's repeated "Fifth Amendment" objections to prosecutorial questions and jury argument about his post-arrest silence were sufficient to alert the trial court that appellant was complaining of the violation of his post-arrest right to remain silent, as protected by Texas Constitution article I, section 10. *Sanchez v. State*, 707 S.W.2d 575, 582 (Tex. Crim.App.1986) (holding "that a defendant may not be impeached through the use of postarrest, pre-*Miranda* silence since such impeachment violates the defendant's right to be free from compelled self-incrimination.")

The majority states that appellant did not preserve his first point of error for review because he "invoked only the Fifth Amendment" and "failed to make an objection at trial based on the Texas Constitution." As authority, the majority cites *Barnum v. State*, 7 S.W.3d 782, 789–94 (Tex.App.-Amarillo 1999, pet. ref'd) and *Cantu v. State*, 994 S.W.2d 721, 732–33 (Tex.App.-Austin 1999), *pet. dism'd, improvidently granted,* 19 S.W.3d 436 (Tex. Crim.App.2000). In each case, the court's

holding that there was no preservation of error as to Texas constitutional claims is dictum. Violation of the federal constitution's Sixth Amendment Confrontation Clause was the basis for the rulings in both cases, not violation of state constitutional rights against self incrimination.

By contrast, other Texas appellate courts, dealing exclusively with the right to remain silent after arrest, have held that neither invoking "only the Fifth Amendment," nor failing to object at trial based on the Texas Constitution waived the right to claim on appeal the violation of article I, section 10. *Veteto v. State*, 8 S.W.3d 805, 810 (Tex.App.-Waco, 2000, pet.ref'd) (holding objection stating "Fifth Amendment right" grounds sufficient to preserve claim that prosecutor improperly impeached defendant with his post-arrest silence); *Cabrales v. State*, 932 S.W.2d 653, 660 (Tex. App.-Houston [14th Dist.] 1996, no pet.) (holding no waiver of article I, section 10 violation by failing to object at trial that prosecutor's jury argument violated defendant's right against self-incrimination under Texas Constitution).

How precise must an objection be to preserve a complaint of violation of a defendant's post-arrest right to remain silent, when Texas law on the subject is clearly settled? The State asserts in its brief that "the trial court *could not possibly have understood* that the appellant was objecting to the use of post-arrest silence as a violation of the Texas Constitution under *Sanders*[2] [sic]." (Emphasis added). Why not? This argument assumes that a Texas trial court would be aware of the limited federal constitutional right to post-

2. The State inadvertently wrote *"Sanders"* in its appellate brief, obviously meaning *"Sanchez"* [*v. State*]. *Sanders* is nowhere mentioned in the argument section or index of authorities of the State's brief. *Sanchez* is cited elsewhere in the brief's argument, ap-

pears in the index of authorities, and states the quoted protection. Certainly, mistakes will be made; however, context should alert us to what is intended, both in written briefs and in trial objections.

arrest silence announced in *Fletcher v. Weir*[3] (leaving to states to determine whether Fifth Amendment protects post-arrest, pre-*Miranda* silence), but *unaware* that our Texas Court of Criminal Appeals settled the issue in 1986 in *Sanchez* by holding that article I, section 10 fully protects a defendant's post-arrest, pre-*Miranda* silence.

The pertinent words of the Fifth Amendment, "nor shall [any person] be compelled in any criminal case to be a witness against himself," and article I, section 10, "[An accused] shall not be compelled to give evidence against himself," are so nearly identical that a "Fifth Amendment" objection should certainly alert a trial court that the constitutionally protected right to remain silent is being asserted. Article I, section 10 *is* the Texas version of the Fifth Amendment right to remain silent. I conclude that the error was preserved.

**Point of Error One—Cross-Examination of Appellant About His Post-Arrest Silence**

Appellant asserts in his first point of error that the trial court erred in overruling his objection to the State's impeaching him on cross-examination about his post-arrest silence.

The majority opinion's short summary of the State's cross-examination does not convey the prosecutor's relentless pursuit of the subject of appellant's silence—from permissible pre-arrest investigation well past the point where appellant's right to post-arrest silence began.

The prosecutor's first five questions on cross-examination of appellant dealt with whether he was aware that Detective Fitzgerald was trying to contact him during the investigation, and appellant's failure to meet or speak with him. Appellant object-ed to the prosecutor's first question, citing the Fifth Amendment.

> Prosecutor: Mr. Heidelberg, you certainly knew that Detective Fitzgerald was trying to get a hold of you [to] talk to you, didn't you?

> Defense Counsel: Objection, Your Honor. This goes to the Fifth Amendment right, my client's Fifth Amendment. He doesn't have to talk to anybody.

> The Court: Be overruled.

The trial court's ruling was correct; the prosecutor's question did not indicate whether the time period inquired about was before or after appellant's arrest. A defendant's "[p]re-arrest silence is a constitutionally permissible area of inquiry." *Peters v. State*, 997 S.W.2d 377, 388 (Tex. App.-Beaumont 1999, no pet.) (citing *Waldo v. State*, 746 S.W.2d 750, 755 (Tex.Crim. App.1988)).

However, the cross-examination continued:

> Prosecutor: Answer the question. You certainly knew that Detective Fitzgerald was trying to get ahold of you to talk to you about this case?

> [Appellant]: No, I did not. I had gotten messages to call someone, but it wasn't who; it was just a number.

> Prosecutor: Isn't it true on January 14th of this year you called Detective Fitzgerald's office in response to an attempt on his part to get ahold of you?

> [Appellant]: Yes, they had gave me the number which I didn't know. And once I called, it was an answering machine stating who it was so I had left a message, you know.

---

**3.** 455 U.S. 603, 607, 102 S.Ct. 1309, 1312, 71 L.Ed.2d 490 (1982).

Prosecutor: So you certainly knew that Fitzgerald was trying to talk with you about this case?

[Appellant]: No, I didn't know it was about this case. I didn't know what it was about.

Prosecutor: *Did you ever ask to talk to the detective about this case once you knew that the charges were there?*

[Appellant]: I didn't know about any charges until July [4] of this year.

Prosecutor: *And in July of this year did you ask to talk to the detective on the case?*

[Appellant]: *Well, I was already incarcerated.* So—

Prosecutor: Well, did you ever ask anyone—

Defense Counsel: *Objection, Your Honor. This goes to the Fifth Amendment.*

This objection, unlike appellant's earlier "Fifth Amendment" objection, was clearly made in response to a post-arrest event.

The Court: Overruled. Answer the question.

[Appellant]: *Did I ask to talk to a detective?*

Prosecutor: Yes, sir.

[Appellant]: *No.*

Prosecutor: Because you certainly—you certainly could have talked with the detective about all these horrible things that [the complainant] has gone through that have lead her to lie—let me finish my question.

[Appellant]: Sorry.

Prosecutor: You certainly could have talked with the investigating officer on this case and explained to him, in your opinion, why [the complainant] made this up; right?

Defense Counsel: *Objection, Your Honor. My client—all of this line of questioning goes to the Fifth Amendment. My client does not have to speak with anyone about it.*

The Court: Be overruled.

[Appellant]: Could you ask the question again, please?

Prosecutor: *You could have talked with the investigating officer once you knew about the charges* and explained to him how this was a false allegation and why it was a false allegation.

[Appellant]: Well, *when I knew about it, I didn't know that I had to talk to any detective* or anything about it. I did request to see an attorney so I could tell them about it, to tell someone. *When I got arrested I told whoever the detectives I talked to about it.*

Prosecutor: *Did you ever make any attempt to talk to the detective on this case to tell him your side?*

Defense Counsel: Objection, Your Honor. This is asked and answered.

Prosecutor: I don't think he's answered it yet, Judge, or I wouldn't keep asking.

The Court: Be overruled. Answer the question.

[Appellant]: *When I was incarcerated, I did.*

Prosecutor: *You did?*

[Appellant]: *Yes.*

Prosecutor: *Who did you talk to about it, which detective?*

[Appellant]: When I was going through—well, *I don't know if they*

---

**4.** The transcript discloses that Detective Fitzgerald's "Probable Cause" affidavit was filed and appellant was charged with the offense on January 29, 1999. Appellant appeared in the District Court on February 1, 1999, where he was given his statutory warning. A true bill of indictment was returned on February 11, 1999.

*were a detective or not, but whoever was telling me about it and they were asking me about it, I was telling them.* So I guess they were the ones who was in charge or I don't know.

Prosecutor: *Did you ever say, "I want to talk to the detective that handled this case?"*

[Appellant]: *No, I did not.*

Prosecutor: Pass this witness, Your Honor.

(Emphasis added).

I would hold that the error was preserved because the objection was sufficient to alert the trial court that appellant was challenging the prosecutor's inquiry into his constitutionally protected post-arrest silence.

### Point of Error Two—the State's Rebuttal Evidence of Appellant's Post–Arrest Silence

Appellant asserts in his second point of error that the trial court erred in permitting the prosecutor, over his objection, to elicit testimony from Detective Fitzgerald about appellant's post-arrest silence. During rebuttal after the defense's evidence, the prosecutor questioned Detective Fitzgerald as follows:

Prosecutor: You told the jury that part of your procedure is to make contact with a suspect to get their side of the story?

Witness: Yes, ma'am.

Prosecutor: Did you attempt to do that in this case?

Witness: Yes, ma'am. I did.

Prosecutor: *Were you able to make contact with the defendant?*

Witness: *In a way.*

Defense Counsel: Objection, Your Honor. I would like to renew my objection as to my client's Fifth Amendment right.

The Court: Be overruled.

Defense Counsel: *May I have a standing objection* throughout so I'm not having to—

The Court: You may.

Defense Counsel:—keep getting up?

Prosecutor: Did you make contact with him?

Witness: *In a manner of speaking, yes, ma'am.* ·

(Emphasis added)

In the next eight questions and answers, the prosecutor developed Fitzgerald's effort to contact appellant through messages and telephone numbers left with others, and Fitzgerald's receipt of two telephone calls from appellant on an answering machine. In the first call, on January 14, 2001, appellant "identified himself, didn't leave a number and said 'I'll call you back later'" Appellant's second message to Fitzgerald was on January 23, a Saturday, and Fitzgerald did not receive it until the following Monday. Both were clearly pre-arrest calls, and appellant's objection was properly overruled. *Waldo,* 746 S.W.2d at 755; *Peters,* 997 S.W.2d at 388 (holding that questions about defendant's pre-arrest silence is admissible). However, the next question and answer were:

Prosecutor: *Once the defendant was placed under arrest, had he wanted to talk to you, would you have sat down and spoken with him?*

Witness: Oh, definitely; yes, ma'am.

Appellant's "standing objection" covered the prosecutor's post-arrest question as well as the her earlier pre-arrest inquiries. I would hold that appellant's "Fifth Amendment" objection was sufficient to apprise the trial court of appellant's objection to Detective Fitzgerald's testimony about appellant's constitutionally protected post-arrest silence. *Veteto,* 8 S.W.3d at 810–11. Thus, I would hold that the trial

court erred in allowing the question and answer.

### Point of Error Four—Prosecutorial Comments in Final Argument about Appellant's Post–Arrest Silence

In point of error four, appellant asserts the trial court erred in overruling his objection to the following State's rebuttal argument at the guilt/innocence stage.

> Prosecutor: Do you really believe *he wanted to wait five months from the date of arrest,* he saved all that information *to come and tell you?* Of course not, that's garbage.

> Defense Counsel: Your Honor, I object again. And may I have a standing objection to any reference to the Fifth Amendment?

> The Court: That will be overruled.

(Emphasis added).

The prosecutor's comment clearly referred to appellant's post-arrest period. As in points of error one and two, appellant's "Fifth Amendment" objection was sufficient to apprise the trial court of the objection to testimony about appellant's constitutionally protected right to post-arrest silence. *See Veteto,* 8 S.W.3d at 810–11. I would therefore hold that the trial court erred in allowing the argument.

Constitutional errors in jury argument, as well as in questions to witnesses, require analysis under the *Harris* standard of constitutional error review. *Thompson,* 89 S.W.3d 843, 851–52 (Tex.App.-Houston [1st Dist.], 2002, pet. ref'd) (holding that prosecutor's closing remarks amounted to constitutional error and required Texas Rule of Appellate Procedure 44.2(a) analysis applying *Harris* standard); *see also Orona v. State,* 791 S.W.2d 125, 130 (Tex. Crim.App.1990).

### Were the Errors Harmless Beyond a Reasonable Doubt?

Texas Rule of Appellate Procedure 44.2(a) mandates that we reverse appellant's conviction unless we determine beyond a reasonable doubt that the errors made no contribution to it. In assessing harm, we are required to examine the record to consider: (1) the source of the error; (2) the nature of the error; (3) whether or to what extent it was emphasized by the State; (4) its probable collateral implications; (5) how much weight the jury would probably place on the error; and (6) whether declaring the error harmless would encourage the State to repeat it with impunity. *Harris,* 790 S.W.2d at 587.

The source of the error was the State, *i.e.,* the prosecutor's repeated questions about appellant's post-arrest silence. The trial court's rulings, overruling appellant's objections, enhanced the error and placed the trial court's approval on it. *See Godfrey v. State,* 859 S.W.2d 583, 585 (Tex. App.-Houston [14th Dist.], 1993, no pet.). Had the trial court sustained appellant's objections and instructed the jury to disregard the improper questions and argument, we would have to consider only whether the potential prejudice was cured. *Veteto,* 8 S.W.3d at 811. I would hold that this first factor favors a finding of harm.

The nature of the errors in points one, two, and four were violations of appellant's constitutional right against self-incrimination by infringement on his right to post-arrest silence. The prosecutor's questions to appellant and Detective Fitzgerald repeatedly elicited that, after his arrest, appellant never asked to speak to the investigating detective, Fitzgerald, to give his version of the events of the case—a position inconsistent with appellant's claim of innocence at trial. The prosecutor's closing argument emphasized appellant's decision not to speak up and answer the accu-

sations. This factor also favors a finding of harm.

The error was emphasized by the State. The prosecutor asked appellant directly, at least twice, whether he ever tried to talk to Detective Fitzgerald about the case after his arrest. She then asked Fitzgerald on rebuttal whether, once appellant was placed under arrest, Fitzgerald would have sat down with appellant and spoken with him. In closing argument, the prosecutor asked the jurors if they "really believed [appellant] wanted to wait five months from the date of arrest" and "[saved] all that information to come and tell you." The prosecutor's closing argument underscored appellant's unwillingness to cooperate with the investigation after his arrest. I conclude that the State emphasized the error, a third factor showing harm to appellant.

The probable collateral implication of the errors was to diminish and offset appellant's defensive theory that the offense did not occur, or that, if it did, he did not commit the offense. Appellant's silence, both pre- and post-arrest, was the exclusive topic of the prosecutor's short cross-examination of appellant. As trial strategy, the prosecutor's questions on cross-examination undermined the strong protestations of innocence with which appellant had concluded his direct examination testimony only moments before. I would hold that this factor, too, harmed appellant.

In evaluating the weight that jurors would probably place on the error, we must acknowledge that

> [w]e do not know what might have gone through a juror's mind. It is certainly conceivable that a juror thought [he or she] should know about any post-arrest conversations or silence of [the defendant]. [The juror] may have believed [the defendant] was trying to hide some-

thing and the ... prosecutor was doing everything he could to present it to [the juror].

*Veteto*, 8 S.W.3d at 813. Appellant's repeated objections to the improper post-arrest inquiries may well have suggested that "he was trying to hide something from the jury." *Id.* I believe that the weight jurors would place on the repeated error, both in evidence and in argument, was harmful to appellant.

The final *Harris* factor to consider is whether our declaring the error harmless might encourage the State to repeat it with impunity. As in *Mendoza*, "we cannot ignore the fact that the prohibition on commenting or inquiring into the post-arrest silence of the accused has been settled law of the land for at least 20 years." *Mendoza v. State*, 959 S.W.2d 321, 326 (Tex.App.-Waco 1997, pet. ref'd). The State's repeating the constitutional error through the testimony of two witnesses, and referring to it in closing argument, militates against the State on that factor. I conclude that declaring the error harmless will encourage its repetition.

In addition to its five-factor harm analysis, *Harris* further restates in a variety of ways the concept whether error is harmless beyond a reasonable doubt. In applying the harmless-error rule, our Court of Criminal Appeals instructs that we must "focus not on the weight of the *other* evidence of guilt, but rather on whether *the error at issue* might possibly have prejudiced the jurors' decision making." *Harris*, 790 S.W.2d at 587 (emphasis added). Can we say that "the nature of the error is such that it could not have affected the jury"? *Id.* Could a rational trier of fact "have reached a different result if the error and its effects had not resulted"? *Id.* at 588. I believe the answer to the last question is, unavoidably, "Yes."

The essential issue in the case was, as the prosecutor argued, the credibility of the complainant, on the one hand, and appellant on the other. As the prosecutor stated in closing argument, "You have to decide, either [the complainant] is telling the truth or the defendant is telling the truth. That's really all you have to decide, everything else falls in line once you reach that decision."

I would hold that the violation of appellant's rights under Texas Constitution article I, section 10 by the prosecutor's questions directed to him and to Detective Fitzgerald, combined with the prosecutor's comments in closing argument about appellant's post-arrest silence, struck at appellant's credibility. I do not believe this Court can say beyond a reasonable doubt that the errors could not have prejudiced the jurors' decision making, or that without the errors and their effects, a rational fact finder could not have reached a different result. Accordingly, I would sustain appellant's points of error one, two, and four.

## Conclusion

I would hold that the motion for en banc consideration should be granted, appellant's points of error one, two and four should be sustained, the judgment of conviction should be reversed, and the cause remanded to the trial court.