IKEY WEATHERRED V. THE STATE.

No. 17548. Delivered April 24, 1935.
State's Rehearing Granted June 5, 1935.
Appellant's Rehearing Denied January 8, 1936.

The opinion states the case.

*Otis Rogers* and *Joe Spurlock,* both of Fort Worth, for appellant.

*Penn J. Jackson,* District Attorney, of Cleburne, and *Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

CHRISTIAN, JUDGE.—The offense is murder; the punish-

ment, confinement in the penitentiary for eight years.

It was charged in the indictment, in substance, that appellant, with malice aforethought, killed John Green by shooting him with a gun.

Deceased operated a filing station in the city of Cleburne. About 7:30 p. m. on the 16th day of May, 1934, he ordered appellant away from his station. Declining to leave, appellant used language that offended deceased. A difficulty ensued in which appellant, according to the State's testimony, struck at deceased. Deceased secured a meat cleaver and appellant ran across the street and picked up a rock, which he threw at deceased. When he was attempting to get another rock, deceased's son grabbed appellant and threw him to the ground. While he was on top of appellant, deceased came up with the meat cleaver and struck appellant on the head. According to the State's version, appellant left the scene of the difficulty with the statement that he would be back and "it would cost deceased plenty." The proof on the part of the State was to the further effect that shortly after leaving the filling station, appellant stated that he would kill deceased before morning. Approximately an hour and twenty minutes later, while deceased was sitting in front of his station, someone shot him from ambush. Between 10:30 and 11 o'clock on the same night an officer arrested appellant in the town of Cleburne. Appellant's trousers were damp below the knees, and his shoes were wet and muddy. The morning after the homicide officers went to a tree which was about eighty steps from the filing station. About ten feet from the tree they found some empty shells which were designed for a .351 automatic Winchester rifle. In a creek near the place where the shells were discovered the officers found a .351 automatic Winchester rifle. The water in the creek was eight inches deep. The numbers on the gun had been removed. There were tracks on the edge of the creek near the point where the gun was recovered. The shoes appellant had on when arrested were applied to these tracks. The testimony of the officers was to the effect that the shoes fitted the tracks perfectly. One of the officers testified that the imprint of the heel was smooth. Another officer testified that he observed the imprint of a monogram in the heel part of the track. During the progress of the trial appellant's counsel had soil brought from the creek to the courthouse. In the presence of the jury, he handed the officer the shoes appellant wore on the occasion of the homicide. These shoes had a "monogram rubber heel." Pressing the shoes into the dirt, it was shown that the mono-

gram made a plain imprint. Appellant introduced his mother as a witness, who testified on direct examination that she had never seen the rifle the officers found in the creek and which was introduced in evidence. She testified, further, that appellant did not have but one pair of shoes at the time of the homicide, and that he owned no gun. On cross-examination by counsel for the State she testified as follows: "I testified about those shoes, but I don't know where Ikey (appellant) bought those shoes. I did'nt ask him where he bought those shoes. I know as a matter of fact that those shoes have been worked on since the night John Green was killed. They have been in a shoe shop and have had new heels put on them. As to what other work was done to them, they were shined. That work was done in a shoe shop at Fort Worth. As to whether or not that is the shop where they lengthen shoes or shorten shoes or remake them, I did'nt ask them about that. As to whether or not I know there is a shop up there where they can take a No. 7 shoe and cut it down to a No. 6 shoe or make it longer or put new parts in it and shorten it, I don't know a thing about the shoe shops in Fort Worth. I do know that since the time of this killing those shoes have been worked on in a shoe shop in Fort Worth. They do not have the same heels on them now that they had on them at the time John Green was killed. These shoes have not had any new soles put on them since the time of the killing. The heels were worn and one side of the heels were pretty badly worn at the time new heels were put on them since the time of the killing. I carried the shoes to the shoe shop to have that work done myself. I carried them to the shoe shop and had them repaired. I had new heels put on the shoes. I did that on Friday of last week. I knew this trial was set for today. As to what I did with the old heels, I didn't have anything to do with them. Of course, I know those were the same shoes he had on the night he was charged with killing John Green. I don't know the name of the shoe shop I took those shoes to. I don't know anything about the name of the shoe shop. The shoe shop I took the shoes to was behind Renfro's Drug Store on Houston Street, southwest of the old court house."

Appellant did not testify in his own behalf. He introduced a witness who testified that she saw a man behind the tree near where the shells were found on the occasion of the homicide, and that he was wearing suspenders. Appellant's proof was to the effect that he did not wear suspenders. A witness for the State testified that he saw the bulk of a man behind the tree

on the occasion in question, but declared that it was too dark to tell whether he had on suspenders. Based upon testimony that appellant was several blocks away from the scene of the homicide shortly before deceased was shot, the court submitted an instruction on the law of alibi.

We have not undertaken to set out all of the facts and circumstances in evidence.

As already stated, appellant did not testify. In his closing argument, private prosecutor used language as follows: "Roy Lay arrests the defendant and takes him to jail. The defendant says nothing. He explains nothing."

Appellant objected on the ground, among others, that counsel was commenting on his failure to testify. The court sustained the objection and instructed the jury to disregard the remarks for any purpose. We are unable to reach the conclusion that the argument is not violative of the mandatory provisions of Art. 710, C. C. P., which reads as follows: "Any defendant in a criminal action shall be permitted to testify in his own behalf therein, but the failure of any defendant to so testify shall not be taken as a circumstance against him, nor shall the same be alluded to or commented on by counsel in the cause."

A violation of the mandate of the statute constitutes reversible error. Pirtle v. State, 10 S. W. (2d) 564, and authorities cited. An instruction to the jury to disregard an argument clearly violative of the provisions of the statute does not have the effect of curing the error. Bilberry v. State, 281 S. W., 1082.

The judgment is reversed and the cause remanded.

The foregoing opinion of the Commission of Appeals has been examined by the judges of the Court of Criminal Appeals and approved by the Court.

### ON STATE'S MOTION FOR REHEARING.

LATTIMORE, JUDGE.—Our original opinion was based on a supposed error appearing in appellant's bill of exceptions No. 3, which complains of the closing argument of the attorney for the State, who said to the jury, in apparently a continuous statement, as follows: "Roy Lay arrests the defendant and takes him to jail. The defendant says nothing; he explains nothing." The bill recites as follows: "To which language 'The defendant says nothing. He explains nothing,' the defendant then and there in open court and at the time such argument was made duly, properly and timely objected and ex-

cepted for the reason that such argument was outside the record, highly inflammatory and prejudicial to the rights of the defendant; and for the further reason that such language was an argument by counsel to the effect that since defendant had made no statement he was guilty as charged, and an argument to the effect that since defendant had exercised his constitutional and statutory right to remain silent and make no statement that such silence should be taken by the jury as evidence of the defendant's guilt; and for the further reason that such argument was a comment on the part of counsel for the State upon the defendant's failure to testify."

It is also stated therein that appellant moved the court to instruct the jury to disregard the language "The defendant says nothing; he explains nothing," and that the court duly instructed the jury not to consider that argument, but did not so instruct them in writing. The bill certifies nothing further. save to say that the argument was not made in answer or reply to any argument made on behalf of the defendant.

The State's position in regard to this argument is that in all that was then said, the attorney had reference only to the fact that when appellant was arrested and taken to jail he said nothing and made no explanation.

Manifestly this bill is not clear, and the inference that appellant here seeks to have placed upon the statement made, seems forced. If the attorney had said "Lay arrested defendant; the defendant said nothing; Lay took him to jail; the defendant explained nothing," it would be plain that only reference was intended to acts of the officer identical in point of time and occurrence with the failure of the accused to say or explain. This would result from the identity of the tense of the verbs used. The only difference seems to be that instead of using the past tense, as in our language just above, the attorney used the present tense of the verb throughout, saying, in effect, "Lay arrests appellant; appellant says nothing. Lay takes him to jail; appellant explains nothing."

In other words, in order to agree with appellant we would have to adopt the seemingly unfair proposition of cutting in half the statement actually made by the attorney and thus find support for a contention not borne out by the whole statement, the purpose being to lead us to believe that in the last half of the utterance the attorney meant that on this trial appellant had not testified. We can not agree that it is proper to so mutilate the statement made. The setting of a word or words gives character to them and may wholly change their apparent

meaning. A notable illustration of such practice is that of the minister displeased with the manner of hair dressing used by the women of his congregation, who preached from the text "Topnot come down," which was found to be the latter part of the scriptural injunction "Let them that are upon the housetop, not come down."

If we understand anything of phrase construction and interpretation we would be doing plain violence to all the rules if we undertook to say, in the absence of anything to justify such conclusion, looking to the entire utterance above quoted, that in what was said the attorney intended, or the jury understood, that in the first part of his utterance, to-wit: "Lay arrests the defendant; he takes him to jail," the attorney referred to what took place on the night of the homicide, and that when he went at once on in the same connection and said "The defendant says nothing; he explains nothing,"—by this the attorney turned completely away from the time first referred to and intended a reference to the immediate occurrences during the trial and to the fact that the accused had not testified.

The language of the objection above quoted, in all save the concluding phrase, suggests that it was aimed at something said at the time of the arrest. The words "Outside the record" mean that there were no testimony that appellant said or explained anything to Lay. The further statement in the objection "Such language was an argument * * * that since defendant had made no statement," appears clearly to be aimed at an argument that the defendant then made no statement, and not to the fact that he now gives no testimony. We observe that the learned trial judge was personally present and saw and heard said argument, the tone, gesture, manner and connection. While the judge instructed the jury not to consider the argument, which is usually done by trial judges when there is any sort of question in their mind regarding argument, he does not certify, nor was he asked to certify, nor can we conclude from the language used when taken altogether, that there was any necessary reference to the failure of the accused to testify as a witness in this case. Reasoning further, manifestly the first and natural inference from the whole statement would be that the time the defendant "Says nothing and explains nothing," would be when "Lay arrests him and takes him to jail."

In Reinhard v. State, 52 Texas Crim. Rep., 64, discussing an argument claimed to be a reference to the failure of the accused to testify, Judge Davidson, for the court, says: "Wherever a bill of exceptions brings to the attention of this court a matter

for review, it must be specific and certain enough to point out the error, and not leave it to inference. The ruling of the trial court will be presumed to be correct, and, in order to overcome this presumption, the record, in a legal way and with legal sufficiency,—must manifest the error requiring a reversal of the ruling of the trial court. We do not believe this bill is in such condition that it requires us to reverse this judgment." In Huff v. State, 103 S. W., 394, the same eminent jurist, again discussing an argument, says that the bill of exceptions must show on its face that the error complained of was such in fact.

Under many decisions of this court we have laid down the rule that an argument must go beyond the proposition that it *might* be construed as a reference to the failure of the accused to testify, and we have held that only in case same *must* have such effect when fairly construed, would the argument be held reversible error. In Jones v. State, 85 Texas Crim. Rep., 538, speaking through Judge Morrow, the court says: "The rule which appears to have been established is that the implication must be a necessary one." The same language is found in Boone v. State, 90 Texas Crim. Rep., 377. In Singleton v. State, 93 Texas Crim. Rep., 111, Judge Hawkins italicizes the fact that such implication must be necessary, and in Hubbard v. State, 94 Texas Crim. Rep., 482, the court says, through the writer hereof: "We do not regard the argument as one whose necessary effect was a reference to appellant's failure to testify." See, also, Johnson v. State, 114 Texas Crim. Rep., 113; Kennington v. State, 120 Texas Crim. Rep., 195.

No reason is perceived why ordinary rules laid down by text writers, when construing words and phrases in statutes and contracts, might not be resorted to. In Black on Interpretation of Laws, p. 135, Horn Book Series, we find this statement: "Associated words explain and limit each other. When a word used in a statute is ambiguous or vague, its meaning may be made clear and specific by considering the company in which found, and the meaning of the terms which are associated with it."

It would appear a permissible paraphrase to say that when words appear in a statement whose meaning and inference are vague and not clear, their meaning may be arrived at by considering the other things said and words used at the same time and in the same connection.

What were the facts had in mind by the attorney when making the argument? This appellant shortly before this homicide had a fight with the man who was killed. Appellant went

away after the fight with a threat to get a gun and kill deceased. After the shooting all the officers of the town were looking for appellant. He appears with wet and muddy shoes; his pants wet half-way up to his knees. He contacts an officer whom he has known all of his life; talks with him, and is carried to jail. He makes no explanation to the officer of how his shoes and clothes became wet. He tells him nothing of where he has been or been doing, or what caused his condition, or why the officer could not find him. Without giving us any light on what the attorney may have previously said leading up to the entire statement, it is merely set out in the bill that said attorney, referring to officer Lay, who first made contact with appellant after the homicide, and who arrested him and took him to jail,—states that defendant says nothing, he explains nothing. We hold that this would appear from the other words used, from the facts making up the setting, to at least be as susceptible of the interpretation that said statement of the attorney referred to the fact that appellant said nothing and explained nothing to officer Lay, as it would be to give to same the interpretation that said attorney intended by said statement to refer to appellant's failure to testify, and under all the authorities cited, if this be true, appellant's complaint of the argument is not well founded. There was evidence in the record, brought out by both sides, that when arrested appellant said nothing and made no explanation.

We have examined each of appellant's other bills of exception. One brings forward complaint of the charge, none of the criticisms of which seem well founded. Another complains of additional argument of the attorney for the State, which argument, for aught we know from the bill, may have been amply supported by testimony. The fourth and remaining bill sets out that in argument the attorney said "John Green was murdered and there sits his murderer," pointing to appellant. Under undisputed facts Green was sitting in his filling station when shot by some one from out in the dark. This was murder. All who heard the argument knew that the attorney making same was not a witness, and that he was but expressing his opinion on the facts. We think none of the bills of exception show any error.

The State's motion for rehearing is granted, the judgment of reversal is set aside, and the judgment is now affirmed.

*Affirmed.*

ON APPELLANT'S MOTION FOR REHEARING.

LATTIMORE, JUDGE.—In his motion for rehearing appellant urges that even if we be correct in our holding that the argument of the State, discussed in our opinion, had reference to his failure to say anything or make any explanation at the time Roy Lay met him after the alleged homicide,—such argument would still constitute reversible error. We have read with interest the authorities cited by appellant in his motion, and have again gone over the others referred to in his original brief on this point, but are of opinion that the facts in each case cited differ so materially from those before us as that the announcement in none of said cases support appellant's contention here.

It is clear from the record that upon this trial the State did not attempt to prove by Mr. Lay that appellant did or did not make any statement when the two men met after the homicide, or at any time before appellant was taken away to jail. Lay was used as a witness to prove that when he first met appellant after the killing, the pants and shoes of appellant were wet and showed to have had mud on them recently; that they had been wiped off, etc. The record further shows that when appellant's counsel took Mr. Lay upon cross-examination, he was asked and testified that he and appellant had known each other from boyhood, and when they met that night appellant first accosted Lay. We quote: "He (appellant) holloed at me, and asked me for a cigarette. I said to him 'Ike, where have you been, every law in town is looking for you,' or something to that effect. His response was, 'What for?' In other words, when I told him the officers were hunting for him he asked me 'What for.' I didn't tell him just what they were hunting him for. Ike then said, 'Well, here I am,' or something to that effect. That was the extent of the conversation I had with Ikey before the officers came up and placed him under arrest."

These facts clearly differentiate this case from all those cited in appellant's original brief and in support of his motion for rehearing. See Skirlock v. State, 272 S. W., 782; Williams v. State, 272 S. W., 783; McIlveene v. State, 272 S. W., 185; Brown v. State, 276 S. W., 929; Russell v. State, 12 S. W. (2d) 1027; Henson v. State, 276 S. W., 926; Taylor v. State, 42 S. W. (2d) 426; Goodman v. State, 285 S. W., 821.

Certainly the accused has a right to keep silent when arrested, and the fact of such silence may not be brought out by the State either in testimony or in argument as a guilty cir-

cumstance. Likewise when under arrest and unwarned,—statements of the accused may not be offered by the State; but no such rule can be invoked here, nor has it any application. In this case the accused brought out as a defensive matter from officer Lay that when he first met appellant after the shooting appellant accosted him and that the conversation was as above quoted, supporting the proposition, on the part of the defense, that appellant knew nothing of the shooting, and hence knew nothing as to why the officers were looking for him. Appellant not only proved by Lay what was then said by the appellant to Lay, but also went further and proved by Mr. Lay that this was all appellant said. It would certainly be a departure for this court to say that the accused might prove as defensive facts all that he had said on an occasion when he met the officers, and might go further and prove that he said nothing else at such time, apparently having in mind that the statement so made or the silence so proved was favorable to the accused; and that the State would then be forbidden to meet by proof or argument such defensive proof and procedure. In all of the cases above cited and in others appearing in appellant's brief and motion, the facts show that the State took the initiative and made the proof and used the silence of the accused as a weapon of attack upon him. No such facts appear in this record.

It has been said that the accused may waive anything save his right of trial by jury,—but he may now waive that in appropriate cases. So when he waives his right to keep from the jury the fact that he said nothing when arrested, and when he in legal effect introduces proof as to defensive statements made by him when first accosted by officers, and introduces as a defense the fact that he said nothing beside what he himself proved to be his statements at such time,—he has waived his right of complaint at argument of the State, which goes no further than to call the attention of the jury to what had been proved by the defendant.

We are of opinion that the case was properly decided, and that the motion for rehearing by appellant should be overruled, and it is so ordered.

*Overruled.*