IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. AP-75,263






EX PARTE DONALD C. HEIDELBERG, Applicant








ON APPLICATION FOR A WRIT OF HABEAS CORPUS


FROM HARRIS COUNTY






 Price, J., delivered the opinion of the Court in which Meyers, Womack,
Johnson, and Holcomb, JJ., joined. Keller, P.J., and Cochran, J., concurred in the
result. Hervey, J., filed a dissenting opinion in which Keasler, J., joined.


O P I N I O N



 After a jury trial the applicant was convicted of aggravated sexual assault and
sentenced to twenty-five years in prison. On appeal, the applicant argued that his conviction
should have been reversed because the prosecutor invited the jury to consider the applicant's
post-arrest silence against him during testimony and in her final summation, in violation of
our state constitutional privilege against self-incrimination. (1) In a published opinion, the
Houston First Court of Appeals held that the applicant had failed to preserve the state
constitutional issue, having invoked only the Fifth Amendment to the United States
Constitution in his trial objection. (2) This Court affirmed the judgment of the court of appeals
in a published opinion on the applicant's petition for discretionary review. (3)

 In his post-conviction application for writ of habeas corpus brought pursuant to
Article 11.07 of the Texas Code of Criminal Procedure, (4) the applicant now argues that his
trial counsel provided ineffective assistance of counsel under the Sixth Amendment to the
United States Constitution in failing to invoke our state constitutional provision in his trial
objection to the prosecutor's invitation to the jury to consider his post-arrest silence. (5) He
presents an affidavit from trial counsel in which she acknowledges that her pretrial research
had been inadequate to inform her that a state constitutional objection could have been made,
and that her failure to do so was not a matter of trial strategy. (6) We hold that the applicant has
satisfied both the performance and prejudice prongs of Strickland v. Washington, (7) and
therefore grant relief.

I. The Facts


A. The Evidence


 In our opinion on discretionary review we did not review the evidence in the case,
because our focus was on the issue of error preservation. But in its opinion on direct appeal,
the court of appeals, and particularly Justice Duggan in his dissenting opinion, exhaustively
reviewed the evidence presented by both the State and the applicant at the guilt phase of trial. 
We direct the reader to Justice Duggan's opinion and will summarize here. (8)

 In December of 1998, the complainant was the eight-year-old daughter of divorced
parents who lived with her father, Derek, and spent weekends with her mother, Shannon. 
Shannon lived in a one-bedroom apartment. Shannon's mother, Vernee, who was married
to, but separated from, the applicant, lived in the same apartment complex. The complainant
spent Christmas evening and the next day with Shannon. On the night of December 26,
1998, Shannon made plans to go out and persuaded Vernee and the applicant to babysit for
the complainant. According to the complainant's testimony, on four separate occasions
during the night the applicant came into the bedroom where the complainant was sleeping. 
On the first occasion, she testified, the applicant used the bathroom. On the second and third
occasions, he pulled down her underwear and fondled her with his hand. On the last
occasion, he put his penis "against" her anus, and penetrated it "a little bit." (9) Afterwards she
felt something wet, and the applicant retrieved toilet paper from the bathroom to wipe her
dry. When she saw the applicant the next day, he "made a face" at her that scared her.

 The next day, December 27th, the complainant told her father's fiancee, Rae Jean,
about the assault, in an account that was consistent with her trial testimony except that she
did not mention the wetness. (She had also mentioned the assault, without going into detail,
to her mother, Shannon, and to Rae Jean's daughter.) Rae Jean testified that, in her opinion,
the complainant was not lying. The complainant told the doctor who examined her on
December 29th that her "Paw-Paw" had touched her with his hand and penis. (10) The doctor
found physical signs in the complainant's rectum that were consistent with her account of
penile penetration-enough to make the doctor "suspicious" in light of the complainant's
story. The doctor found no vaginal injuries, but testified that with digital penetration, only
about 30 % of the cases will manifest some visible injury.

 Vernee, the complainant's grandmother, testified for the defense. She told the jury
that on the night of the assault, she, the applicant, and the complainant had all watched a
television program about the Jon Benet Ramsey case. (11) The complainant had gone to bed at
some point before Shannon left the apartment at 11:00 p.m., and Vernee and the applicant
watched television for a while before the applicant fell asleep on the floor. Vernee continued
to watch television for a while longer, and then fell asleep on the couch. She described
herself as not a heavy sleeper, and felt that the complainant's account could not be true,
because "there's no way none of that could have happened while I was standing there." She
testified that she does not believe the complainant's story. (12) 

 The applicant also testified, denying in emphatic terms that he had committed this or
any other such offense, or that he was "a child molester" or "any kind of perverted person." 
He testified that he had babysat for the complainant for Shannon "quite often" in the past, (13)
that he had always had a good relationship with the complainant, and that he was "shocked"
and "upset" at her allegations. Everything was normal between the applicant and the
complainant the next day when he saw her. (14)

 In rebuttal, the State put Shannon on the stand. Shannon denied that the complainant
had been watching television with Vernee and the applicant before she left the apartment on
the night of the 26th. When she got home early the next morning, Shannon found Vernee
asleep on the couch, and the applicant sleeping on the floor. She found the complainant 
awake in the bedroom. (15) The next day she observed that the complainant and the applicant
did not interact in their usual way, but were very subdued together.

 Various witnesses described the complainant as, e.g., a "willful," "strong-willed," and
"outspoken" child who sometimes lied about things. Both Vernee and the applicant
maintained, and the complainant admitted, that she was often unhappy with Shannon because
Shannon would leave her with babysitters on the weekends when she had custody of the
complainant, and did not pay enough attention to her. In final summation, the applicant's
trial counsel suggested to the jury, albeit somewhat obliquely, that the complainant had made
up the account of the applicant sexually assaulting her in order to dissuade her mother from
leaving her with babysitters. (16)

B. Post-Arrest Silence


 During the State's cross-examination of the applicant, the prosecutor made several
references to the fact that the applicant never attempted to contact the investigating officer,
James Fitzgerald, a detective in the Harris County Sheriff's office, "to talk to [him] about this
case." The prosecutor asked:

 Q. Did you ever ask to talk to the detective about this case once you knew
that the charges were there?


 A. I didn't know about any charges until July of this year.


 Q. And in July of this year did you ask to talk to the detective on the case?


 A. Well, I was already incarcerated. So -


 Q. Well, did you ever ask anyone -


 [Defense Counsel]: Objection, Your Honor. This goes to the Fifth
Amendment.


 THE COURT: Overruled. Answer the question.


 A. Did I ask to talk to a detective?


 Q. ([Prosecutor]) Yes, Sir.


 A. No.


 Q. Because you certainly - you certainly could have talked with the
detective about all these horrible things that [the complainant] has gone
through that have led her to lie-let me finish my question.


 A. Sorry.


 Q. You certainly could have talked with the investigating officer in this
case and explained to him, in your opinion, why [the complainant]
made this up; right?


 [Defense Counsel]: Objection, Your Honor. My client - all of this line
of questioning goes to the Fifth Amendment. My client does not have to speak
to anyone about it.


 THE COURT: Be overruled.


 A. Could you ask the question again, please.


 Q. ([Prosecutor]) You could have talked with the investigating officer
once you knew about the charges and explained to him how this was a
false allegation and why it was a false allegation?


 A. Well, when I knew about it, I didn't know that I had to talk to any
detective or anything about it. I did request to see an attorney so I
could tell them about it, to tell someone. When I got arrested I told
whoever the detectives I talked to about it.


 Q. Did you ever make any attempt to talk to the detective on this case to
tell him your side?


 [Defense Counsel]: Objection, Your Honor. This is asked and
answered.


 ([Prosecutor]): I don't think he's answered it yet, Judge, or I wouldn't
keep asking.


 THE COURT: Be overruled. Answer the question.


 A. When I was incarcerated, I did.


 Q. ([Prosecutor]) You did?


 A. Yes.


 Q. Who did you talk to about it, which detective?


 A. When I was going through - well, I don't know if they were a detective
or not, but whoever was telling me about it and they were asking me
about it, I was telling them. So I guess they were the ones who was in
charge or I don't know.


 Q. Did you ever say, "I want to talk to the detective that handled this
case?"


 A. No, I did not. (17)

 

 The habeas writ record reveals that the applicant was indicted on February 11, 1999. 
Although a warrant had issued for the applicant's arrest as early as January 30, 1999, he was
not in fact arrested until six months later, on July 28, 1999. During trial, however, the jury
was never unequivocally informed of the exact date of the applicant's arrest. It is therefore
conceivable that the prosecutor's initial question ("Did you ever ask to talk to the detective
about this case once you knew that the charges were there?") could have related to the time
between the applicant's indictment and his arrest, from February 11th to July 28th, 1999. But
once the applicant asserted that he did not know about the charges until July, when he was
"already incarcerated," it is more likely than not that the jury would have understood the
subject of the remaining colloquy to be the appellant's post-arrest failure to approach the
investigating detective to tell his side of the story.

 Later, the State's allusions to the applicant's post-arrest silence became more explicit. 
At the end of the State's re-direct examination of Detective Fitzgerald, the State's final
question to him by its very terms related to the applicant's post-arrest silence. The prosecutor
asked Detective Fitzgerald:

 Q. Once the defendant was placed under arrest, had he wanted to talk to
you, would you have sat down and spoken with him?


 A. Oh, definitely; yes, ma'am.


And later still, during her final summation to the jury, the prosecutor again alluded
unequivocally to the applicant's post-arrest silence, in the following exchange:

 Let's talk about the defendant for a minute. You know, every defendant
that's accused has a motive to say something other than - yeah, they're going
to get up and say, "I didn't do it," but you know, he's had an opportunity since
the end of December -


 [Defense Counsel]: Objection, Your Honor. I would like to renew my
objection to the Fifth Amendment.


 THE COURT: Be overruled.


 [Prosecutor]: He knew Detective Fitzgerald was trying to get ahold of
him, he called him back twice. He knew who, he knew the phone number. Do
you believe, honestly believe for one minute that he didn't have the
opportunity to tell Detective Fitzgerald his story? Of course not, that's
garbage.


 Do you really believe he wanted to wait five months from the date of
arrest, he saved all that information to come and tell you? Of course not,
that's garbage.


Defense counsel's renewed Fifth Amendment objection was again overruled. But she never
objected under Article I, Section 10 of the Texas Constitution.

II. The Law


 The test for ineffective assistance of counsel, as articulated in Strickland v.
Washington, (18) and adopted by this Court in Hernandez v. State, (19) is comprised of two prongs. 
The first prong inquires whether "counsel's performance was deficient." (20) To establish his
counsel was deficient, a habeas applicant must show by a preponderance of the evidence that
counsel "made errors so serious that [he] was not functioning as the 'counsel' guaranteed the
defendant by the Sixth Amendment." (21) "In making that determination, the court should keep
in mind that counsel's function, as elaborated in prevailing professional norms, is to make
the adversarial testing process work in the particular case." (22) The second prong requires a
showing that counsel's deficiency actually prejudiced the defendant; that "counsel's errors
were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." (23) 
"The defendant must show that there is a reasonable probability that, but for counsel's
unprofessional errors, the result of the proceeding would have been different. A reasonable
probability is a probability sufficient to undermine confidence in the outcome." (24) This does
not mean, however, that the defendant must show it was "more likely than not" that his
counsel's deficiency was outcome determinative. (25) But it does mean that the defendant must
demonstrate, from concrete facts well founded in the record, that his counsel's deficiency had
more than "some conceivable effect on the outcome of the proceeding." (26)

 Our review of trial counsel's performance is highly deferential, presuming that
counsel's actions fell within the wide range of reasonably professional assistance. (27) Unless
the record affirmatively discounts the possibility, "we must presume that counsel is better
positioned than the appellate court to judge the pragmatism of the particular case, and that
he 'made all significant decisions in the exercise of reasonable professional judgment.'" (28) 
Ordinarily we analyze the "totality of the representation," and we view that totality "as of the
time of trial, and not through hindsight." (29) However, we have also found under some
circumstances that a single error of omission or commission may be sufficiently egregious,
and its deleterious effect sufficiently pervasive and profound, as to undermine our confidence
in the result of the trial. (30)

III. Application of the Law to the Facts


A. The Performance Prong


 "Pre-arrest silence is a constitutionally permissible area of inquiry." (31) But "[a]n
accused's right to be free from compelled self-incrimination under the Texas Constitution
arises at the moment an arrest is effectuated." (32) Consequently, "when the defendant is
arrested, he has the right to remain silent and the right not to have that silence used against
him, even for impeachment purposes, regardless of when he is later advised of those
rights." (33) This state right inheres, whether or not the arresting authorities have given the
defendant his warnings under Miranda v. Arizona. (34) "[T]he fact of such silence may not be
shown by the State, either in testimony or in argument[,] as a guilty circumstance." (35)

 It is true that the lead, modern-day authority for the proposition that the state
constitutional right to remain silent inheres at the point of arrest, Sanchez v. State, is a
plurality opinion. (36) But the holding of the plurality in Sanchez was merely descriptive of
earlier holdings of this Court that have never been repudiated. (37) Sanchez has been cited with
approval by a majority of this Court in a number of decisions since. (38) Moreover, many of the
courts of appeals have cited it as binding authority. (39) Most recently, a majority of this Court
cited Sanchez in disposing of the petition for discretionary review in this very applicant's
case for the proposition that Article I, Section 10 of the Texas Constitution protects against
the use of pre-arrest but post-Miranda silence. (40) We think the law in this respect has long
been well settled.

 Although the applicant's jury was never clearly informed precisely when he was
arrested for this offense, the prosecutor's questions to the applicant nevertheless, in all
likelihood, served to communicate to the jury that the applicant exercised his right to post-arrest silence. Even if the prosecutor's questions to the applicant did not alert the jury to his
post-arrest silence, her final question to Detective Fitzgerald, and her comments to the jury
during summation, unequivocally referred to the applicant's post-arrest silence. There were,
thus, at least two occasions during the course of the applicant's trial, and probably three,
when his trial counsel undoubtedly could have made a valid objection under Article I,
Section 10 of the Texas Constitution-objections which the trial court would have been
obliged, under long-standing precedent from this Court, to sustain. (41)

 The applicant has established through his trial counsel's affidavit that this omission
was not the result of any strategic or tactical consideration on his trial counsel's part. (42) In
fact, trial counsel was aware of the detrimental impact the objectionable allusions had on her
client's defense, as evidenced by the fact that, on each occasion, she invoked the Fifth
Amendment in an attempt to suppress them. She was simply unaware, for lack of prior
knowledge or appropriate legal research, of the fact that our state constitutional privilege
against self-incrimination is more extensive than its federal counterpart under the Fifth
Amendment, and more extensive than the federal due-process protection that was recognized
in Doyle v. Ohio. (43) In order to render effective assistance, trial counsel must have a firm
grasp of the applicable law. (44) We do not impermissibly second-guess the applicant's trial
counsel to hold that her failure to research the applicable law and make the appropriate state-law objection constituted an unprofessional deficiency on her part.

 Nor can we reasonably conclude that trial counsel's deficiency was constitutionally
inconsequential. The omission was not isolated. It occurred on at least two critical
occasions; once to punctuate Detective Fitzgerald's testimony, and again during the State's
final summation, to rebut the argument of the applicant's trial counsel. Moreover, by twice
alluding unequivocally to the applicant's post-arrest silence, sans appropriate objections, the
prosecutor would have cemented the impression that the applicant's own testimony also
alluded to post-arrest, rather than pre-arrest, silence. Thus, although counsel made but one
error of omission, she made it over and over, in such a way that it pervaded the entire trial
proceeding. We conclude that, in failing to make the appropriate objections, trial counsel
rendered deficient representation, and therefore hold that the applicant has satisfied the first
prong of the Strickland test for ineffective assistance of counsel.

B. The Prejudice Prong


 The evidence against the applicant was obviously legally sufficient to convict him,
even absent the allusions to his failure to articulate his defense to the investigating detective. 
But the question of prejudice under Strickland does not turn on whether, discounting trial
counsel's errors of omission or commission, the evidence was otherwise sufficient to
convict. (45) The issue of the applicant's guilt was hotly disputed, and boiled down largely to
a question of the credibility of the parties. The complainant's story was corroborated by her
consistent outcry, and by medical testimony of physical signs that were also consistent with
her account. The applicant took the stand to categorically deny his guilt, however, and he
presented an additional witness who had been present to support his denial. The State did
not attempt to prove that the applicant had committed any other similar offenses against the
complainant to rebut his assertion that such an act was not consistent with his character. (46) 
The applicant supplied at least a tentative basis for the jury to suspect the complainant's
motive in telling such a story. In a case this closely contested, it is more than merely
conceivable that the prosecutor's allusions to the applicant's post-arrest silence may have
tipped the scale against him. (47) On this state of the record, Justice Duggan, who mistakenly
believed that the state constitutional issue had been preserved for appeal, could not "say
beyond a reasonable doubt that the errors could not have prejudiced the jurors' decision
making, or that without the errors and their effects, a rational fact finder could not have
reached a different result." (48) We think the applicant has also shown a "reasonable
probability," as that phrase is properly construed, of a different outcome. (49) Thus, we find that
trial counsel's deficiencies have undermined our confidence in the outcome of the trial, and
hold accordingly that the applicant has satisfied the prejudice prong of Strickland as well.

 The relief sought is therefore granted. The applicant is remanded to the Sheriff of
Harris County to answer to the indictment.


Delivered: November 15, 2006

Do Not Publish

 
1. Tex. Const. art. I, § 10.
2. Heidelberg v. State, 112 S.W.3d 658 (Tex. App.-- Houston [1st] 2003).
3. Heidelberg v. State, 144 S.W.3d 535 (Tex. Crim. App. 2004).
4. Tex. Code Crim. Pro. art. 11.07.
5. Tex. Const. art. I, § 10.
6. Trial counsel's affidavit states, in pertinent part:


 My failure to make the correct legal objections was not the result of
any reasoned tactical or strategic decision. I knew that what the
prosecutor was doing was improper and that it was extremely
prejudicial to the defendant but I failed to make the correct specific
legal objection and simply made a mistake. I had not conducted any
legal research that would have shown me that the prosecution's
improper use of a defendant's pre-arrest silence violates Art. I, Sec.
10 of the Texas Constitution and not the U.S. Constitution. 
7. 466 U.S. 668 (1984).
8. 112 S.W.3d at 665-9.
9. The indictment alleges that the applicant intentionally or knowingly caused the
complainant's anus to contact his sexual organ. 
10. The 47-year-old applicant was the complainant's step-grandfather, and she called him "Paw-Paw."
11. The complainant denied that she had watched this program. Shannon later testified that the
complainant had not been watching television with Vernee and the applicant before she left.
12. The applicant's trial counsel later asked Vernee a second time whether she believed the
complainant, but this time the State objected that the question was "improper," and the objection was
sustained. The State was able to impeach Vernee's credibility with a prior conviction for theft, and
with a prior statement she had given to an investigating officer that was inconsistent with her trial
testimony in several respects. Vernee also denied asking Shannon to try to persuade the complainant
not to testify against the applicant. Shannon testified in rebuttal that Vernee had recently tried to talk
her into persuading the complainant not to testify.
13. In cross-examination, the complainant had acknowledged that the applicant had "watched"
her two or three times. Shannon later claimed that the applicant had "watched" the complainant
"once or twice" along with the complainant's little brother, Caleb, but that there was "never" any
occasion when he had "watched" the complainant alone.
14. Vernee had also testified that the complainant's behavior was no different than usual the next
morning.
15. According to Shannon, the complainant told her, "I have something to tell you." But
because Rae Jean had been designated the State's outcry witness, Shannon was not allowed to testify
to what the complainant told her at this point. See Heidelberg v. State, 112 S.W.3d at 667 n.1. For
her part, the complainant testified that she told her mother that the applicant had touched her "front
and back" with his hand, but she did not tell her that he had "put[ ] his private in [her] back part." 
Shannon was also allowed to testify sans objection that she did not think the complainant was lying.
16. She argued:


 Ladies and gentlemen, I can't give you a motive for [the complainant] to lie,
but I can tell you that this child has been living in an awful situation. She's living -
she is being bounced around. She's not getting the kind of attention that she should
be getting. She has a neglectful mother that doesn't have enough time for her, a
mother who would rather be out partying on a Christmas holiday than with her. This
is an unfair situation for her, ladies and gentlemen.


 What better way to fix this? What better way to say, "Mom, don't ever leave
me with anyone when you go out?" We don't have to understand why, ladies and
gentlemen, to know that it's human nature to get things wrong. It's their human
nature to stretch the truth, it's their human nature to even lie. Children aren't exempt
from this culpability.
17. All emphasis added unless otherwise indicated.
18. 466 U.S. 668 (1984).
19. 726 S.W.2d 53 (Tex. Crim. App. 1986).
20. 466 U.S. at 687.
21. Ibid.
22. Id. at 690.
23. Id. at 687.
24. Id. at 694.
25. Id. at 693. See also, Kyles v. Whitley, 514 U.S. 419, 434 (1995); Strickler v. Greene, 527
U.S. 263, 289-90 (1999); id. at 297-301(Souter, J., concurring and dissenting).
26. Strickland v. Washington, supra, at 693.
27. Ex parte Nailer, 149 S.W.3d 125, 130 (Tex. Crim. App. 2004).
28. Delrio v. State, 840 S.W.2d 443, 447 (Tex. Crim. App. 1992), quoting Strickland, supra,
at 690.
29. Bridge v. State, 726 S.W.2d 558, 571 (Tex. Crim. App. 1986).
30. E.g., Ex parte Felton, 815 S.W.2d 733, 735-6 (Tex. Crim. App. 1991); Thompson v. State,
9 S.W.3d 808, 813 (Tex. Crim. App. 1999); Ex parte Nailer, supra, at 130 n.19.
31. Waldo v. State, 746 S.W.2d 750, 755 (Tex. Crim. App. 1988).
32. Sanchez v. State, 707 S.W.2d 575, 579-80 (Tex. Crim. App. 1986) (plurality opinion).
33. Id. at 580.
34. 384 U.S. 436 (1966).
35. Sanchez v. State, supra, at 579, quoting Redding v. State, 149 Tex.Cr.R. 576, at 577, 197
S.W.2d 357 (1946) (emphasis supplied). Both Redding and the cases cited therein stand for the
proposition that "[t]he state cannot avail itself of appellant's silence during the time he was under
arrest as evidence of his guilt, or as destructive of his explanation given on the trial." 197 S.W.2d
at 357-8, quoting Taylor v. State, 118 Tex. Cr. R. 340, 42 S.W.2d 426, at 427 (1931). In her
dissenting opinion, Judge Hervey suggests that there may be an exception to this legal proposition
when the State uses post-arrest silence "in rebuttal of evidence offered in defense[.]" (Slip op. at 2,
n.3, quoting Redding v. State, supra, at 357). But it is clear from the case that Redding cites for this
proposition, viz: Weatherred v. State, 129 Tex. Cr. R. 514, 89 S.W.2d 212 (1935), that the defendant
himself must first broach the subject of his own post-arrest silence before this exception to the rule
prohibiting the State from commenting on post-arrest silence may apply. In Weatherred the Court
observed:


 Certainly the accused has a right to keep silent when arrested, and the fact of
such silence may not be brought out by the state either in testimony or in argument
as a guilty circumstance. Likewise, when under arrest and unwarned, statements of
the accused may not be offered by the state; but no such rule can be invoked here, nor
has it any application. In this case the accused brought out as a defensive matter
from [the arresting officer] that, when he first met appellant after the shooting,
appellant accosted him, and that the conversation was as above quoted, supporting
the proposition on the part of the defense, that appellant knew nothing of the
shooting, and hence knew nothing as to why the officers were looking for him.


89 S.W.2d at 217. In the instant case, the State used the applicant's silence "as destructive of his
explanation given on the trial." Such use was clearly prohibited under long-standing case law.
36. Three judges joined the opinion in Sanchez. Judge Clinton joined the judgment of the Court,
but his separate concurring opinion leaves absolutely no doubt that he agreed with the plurality
opinion with respect to the question whether use of post-arrest silence violates Article I, Section 10
of the Texas Constitution. Moreover, as Judge Clinton's concurring opinion demonstrates, the
plurality holding in Sanchez was nothing new; a majority of this Court had expressly held at least
as far back as 1923 that Article 1, Section 10 prohibits the use of post-arrest silence, regardless of
whether the appellant had been "cautioned" under our then-"confession" statute. Sanchez, supra,
at 584-5 (Clinton, J., concurring, citing Gardner v. State, 34 S.W. 945 (Tex. Crim. App. 1896), and
Stanton v. State, 94 Tex. Cr. R. 366, 252 S.W. 519 (1923)). In Stanton, after he was arrested but
before he was cautioned under a predecessor to Article 38.22 of the Texas Code of Criminal
Procedure, the defendant was asked whether he wanted to give an explanatory statement, and he
responded that he did not. Invoking the express language of Article I, Section 10, this Court held
that introduction of this testimony of the defendant's post-arrest but pre-warning silence was
"contrary to the constitutional inhibition against requiring a witness to give evidence against
himself." 252 S.W. at 521. We could not possibly have been referring to the right to remain silent
under the federal constitution, of course, since that right was not made applicable to the states until
1964, in Malloy v. Hogan, 378 U.S. 1 (1964).


 Judge Onion concurred in the result, without writing a separate opinion. But, judging by his
opinion in Olson v. State, 484 S.W.2d 756 (Tex. Crim. App. 1969), cited by the plurality in Sanchez,
Judge Onion was far from unsympathetic to the notion that Article I, Section 10 is, in some contexts
at least, more protective of individual rights than its federal counterpart. As Judge Onion observed
in Olson, specifically with respect to Article I, Section 10, "as to the true scope of the Texas
Constitution, we must ultimately follow our own lights." Id. at 762.
37. Sanchez was in no respect overruled, implicitly or otherwise, by Thomas v. State, 723
S.W.2d 696 (Tex. Crim. App. 1986). The issue in Thomas was whether admission of the refusal to
take a breath test constituted the admission of compelled testimony under Article I, Section 10 of the
Texas Constitution. The majority actually cited Sanchez for the proposition that "[i]n interpreting
the meaning of the privilege against self-incrimination under out state constitution, we have made
it clear that, while Supreme Court opinions on the privilege are given some weight, final
determination of the scope of the privilege must come from this Court." Id. at 702. Without even
identifying Sanchez as a plurality opinion, the majority cited it as an example of a construction of
Article I, Section 10 that is more protective than the analogous federal constitutional right. 
38. E.g., Turner v. State, 719 S.W.2d 190, 192-3 (Tex. Crim. App. 1986); Smith v. State, 721
S.W.2d 844, 855 (Tex. Crim. App. 1986); Webb v. State, 763 S.W.2d 773, 775 (Tex. Crim. App.
1989); Bass v. State, 723 S.W.2d 687, 691 n. 7 (Tex. Crim. App. 1986); Thomas v. State, supra; 
McFarland v. State, 845 S.W.2d 824, 844 (Tex. Crim. App. 1992); Heidelberg v. State, supra, at
537. 
39. The following courts of appeals opinions reversed convictions on the basis of the Sanchez
plurality's holding that Article I, Section 10 prohibits prosecutorial use of post-arrest, pre-Miranda
silence: Anderson v. State, 758 S.W.2d 676, 681-4 (Tex. App.--Fort Worth 1988, pet. ref'd); 
Thomas v. State, 812 S.W.2d 346, 349-50 (Tex. App.--Dallas 1991, pet. ref'd); Womack v. State,
834 S.W.2d 545, 546 (Tex. App.--Houston [14th], no pet.); Cabrales v. State, 932 S.W.2d 653, 659-61 (Tex. App.--Houston [14th], no pet.); Mendoza v. State, 959 S.W.2d 321, 323-6 (Tex.
App.--Waco, pet. ref'd); Bhakta v. State, 981 S.W.2d 293 (Tex. App.--San Antonio 1998, pet.
ref'd); Veteto v. State, 8 S.W.3d 805, 810-11 (Tex. App.--Waco 2000, pet. ref'd); Hampton v.
State, 121 S.W.3d 778, 784 (Tex. App.--Austin 2003, pet. ref'd).


 The following courts of appeals opinions have recognized the plurality's holding in Sanchez,
but have declined to reverse the convictions for various reasons unrelated to that holding, such as
harmless error, the failure to preserve error at trial, curative admissibility, or the efficacy of a curative
instruction: LaSalle v. State, 771 S.W.2d 636, 638 (Tex. App.--Corpus Christi 1989, pet. ref'd); 
Young v. State, 803 S.W.2d 335, 338 (Tex. App.--Waco 1990), rev'd on other grounds, 83 S.W.2d.
122 (Tex. Crim. App. 1992)(plurality op.); Harris v. State, 866 S.W.2d 316, 320 (Tex. App.--San
Antonio 1993, pet. ref'd); Garza v. State, 878 S.W.2d 213, 220 (Tex. App.--El Paso 1994, pet.
ref'd); Lum v. State, 903 S.W.2d 365, 369 (Tex. App.--Texarkana 1995, pet. ref'd); Szmalec v.
State, 927 S.W.2d 213, 216 (Tex. App.--Houston [14th] 1996, pet. ref'd); Nixon v. State, 9 40
S.W.2d 687, 692 (Tex. App.--El Paso 1996, pet. ref'd); Miller v. State, 939 S.W.2d 681, 687 (Tex.
App. El Paso 1996, no pet.); Ewing v. State, 971 S.W.2d 204, 208 (Tex. App.--Beaumont 1998,
pet. ref'd); Stroman v. State, 69 S.W.3d 325, 332 (Tex. App.--Texarkana 2002, pet. ref'd); Johnson
v. State, 83 S.W.3d 229, 231 (Tex. App.--Waco 2002, pet. ref'd); Heidelberg v. State, 112 S.W.3d
658, 661 (Tex. App.--Houston [1st] 2003), rev'd on other grounds, 144 S.W.3d 535 (Tex. Crim.
App. 2004); Salazar v. State, 131 S.W.3d 210, 214 (Tex. App.--Fort Worth 2004, pet. ref'd); 
Cleveland v. State, 177 S.W.3d 374, 383-4 (Tex. App.--Houston [1st] 2005, pet. ref'd).
40. Heidelberg v. State, supra, at 537 ("Article I, Section 10 of the Texas Constitution, however,
protects a defendant's post-arrest silence even before [Miranda] warnings have been administered. 
Sanchez v. State, 707 S.W.2d 575, 582 (Tex. Crim. App. 1986).").
41. See Sanchez v. State, supra, at 578-79.
42. See note 6, ante.
43. 426 U.S. 610 (1976). See Sanchez v. State, supra, at 577.
44. Ex parte Welborn, 785 S.W.2d 391, 393, 394 (Tex. Crim. App. 1990).
45. The constitutional test for prejudice in the ineffective-counsel context is identical to the
constitutional test for "materiality" of exculpatory evidence improperly suppressed by the
prosecution. Bagley v. United States, 473 U.S. 667, 682 (1985). In Kyles v. Whitley, supra, at 434-435, the Supreme Court emphasized that the constitutional test for materiality "is not a sufficiency
of the evidence test." "A defendant need not demonstrate that after discounting the inculpatory
evidence in light of the undisclosed evidence, there would not have been enough left to convict." 
Id. at 434-5. See also Strickler v. Greene, supra, at 289-90; id. at 297-8 (Souter, J., concurring and
dissenting). Analogously, in order to demonstrate Strickland prejudice, a defendant need not show
that, discounting trial counsel's deficiencies, the evidence would have been insufficient to support
a rational jury verdict.
46. See Tex. Code Crim. Pro. art. 38.37 (permitting the use of other crimes, wrongs, or acts
by the accused in prosecutions such as this one for its bearing on relevant matters such as the state
of mind of the defendant and his victim, and their previous relationship); Tex. R. Evid. 404(b)
(evidence of other crimes, wrongs, or acts admissible for non-exclusive, non-character-conformity
purposes, e.g., rebut global defensive assertions of innocence or good character); Hammett v. State,
713 S.W.2d 102, 105-6 (Tex. Crim. App. 1986) (defendant may be impeached with evidence of
misconduct to rebut his own assertions of good moral character).
47. See Ex parte Menchaca, 854 S.W.2d 128, 132-3 (Tex. Crim. App. 1993) (trial counsel's
deficiency in failing to exclude extraneous rape conviction that was inadmissibleto impeach the
applicant was prejudicial where prosecution for drug possession turned on credibility of witnesses
in a "West Texas shouting match.").
48. Heidelberg v. State, supra, 112 S.W.2d at 675 (emphasis supplied). 
49. See notes 25 & 45, ante.